Catherine Sweetser (SBN 271142)
Rie Ohta (SBN 329746)
**UCLA LAW CLINICS**
385 Charles E Young Drive
East Los Angeles, CA 90095
Email(s):    csweetser@sshhzlaw.com
            ohta@law.ucla.edu

Paul Hoffman (SBN 071244)
John Washington (SBN 315991)
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
200 Pier Avenue, #226
Hermosa Beach, CA 90245
Telephone: (310) 396-0731
E-Mail(s):   hoffpaul@aol.com
            jwashington@sshhzlaw.com

*Attorneys for Plaintiffs,*
*HUGO GONZALEZ, JOSE BACA,*
*ERICK LOPEZ, MARIO MANJARREZ, and*
*RICARDO SANDOVAL GUADARRAMA.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> The GEO Group, Inc., a Florida corporation, DOES 1-10, <br><br> Defendants. | Case No.: 2:22-cv-4014 <br><br> **[CLASS ACTION]** <br> **CIVIL RIGHTS COMPLAINT** <br> **CALIFORNIA CIV. CODE, § 52.1; § 3294** <br><br> 1.  BATTERY <br> 2.  ASSAULT <br> 3.  NEGLIGENT HIRING, TRAINING, AND SUPERVISION <br> 4.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS <br> 5.  NEGLIGENCE AND FAILURE TO PROVIDE MEDICAL CARE <br> 6.  INTERFERENCE OF CIVIL RIGHTS IN VIOLATION OF THE BANE ACT FIRST, FOURTH, AND FIFTH AMENDMENTS AND CALIFORNIA CONSTITUTIONAL RIGHTS (CAL. CIV. CODE, § 52.1) <br><br> **DEMAND FOR JURY TRIAL** |

1

**INTRODUCTION**

The above-named Plaintiffs, individually and on behalf of others similarly situated, allege the following:

1. This action arises out of the willful and callous retaliation against detainees at the Adelanto detention facility, in connection with a major use of force that was not only an excessive response to a peaceful protest, but also a use of force and deprivation of due process in preventing detainees from accessing eyewash facilities or showers for days after the incident and in locking them into cells covered with pepper spray.

2. In the spring and summer of 2020, protests were taking place outside the Adelanto detention facility in support of shutting the facility down. In retaliation for the protests, the facility adopted a policy of requiring detainees to remain locked inside their cells not just while the protests were happening but for days after. Lockdown required the detainees to be locked in their cells for 23.5 hours of the day, without any time to shower, exercise, receive visitors, or make calls. The detainees in units 3A, 3B, 3C, and 3D decided to protest this policy and to sit outside their cells peacefully the next time the lockdowns were ordered. On June 12, 2020, the plaintiffs remained in the dayroom when the Geo Group guards told them they would be locked down. The majority sat down peacefully in the dayroom, although some continued to move around and engage in normal activities such as eating.

3. The detainees informed the guards that they were engaging in a peaceful protest and that a protest outside the facility was not a good reason to lock them up for days. The detainees otherwise cooperated with GEO officers in routine daily procedures such as "the count." The guards were successful in completing a count of the detainees as they sat on the floor and at the tables. But although the detainees were not resisting and were sitting calmly outside their cells, the facility decided to respond with what under its own rules was a major use of force, to be used only in extreme situations.

4. As the detainees were protesting peacefully, GEO officers in full riot gear entered the detention areas. Officers began shooting pepper balls, which are bullets that contain pepper spray and explode in a cloud of spray on impact, at the detainees, without giving the detainees time to go

to their cells.  The pepper balls hit detainees who were attempting to comply with the order to return to their cells, and were also directed at detainees who were on the ground, attempting to cover their heads and faces. At least one officer even shot into an inhabited cell.  Officers slammed the detainees up against the wall or to the ground and dragged them by their hands or feet across the floor to the cells.  Detainees fell to the ground, hit their heads, sustaining cuts and bruises.  Some of the detainees began throwing up from inhaling the thick clouds of chemicals.  At least one of the detainees collapsed and needed emergency medical care.  Some detainees were taken to the Restricted Housing Unit.  Officers then put detainees under full lockdown for a month.  Many detainees were not given proper cleaning supplies to wash the pepper spray off themselves, out of their clothes, or from their bedsheets.  Detainees were forced to live and sleep with the burning sensation of the chemicals for approximately two weeks after the incident.

5.  Defendants interfered with the exercise and enjoyment of Plaintiff's civil rights as guaranteed by the First, Fourth, and Fifth Amendments. Defendants interfered with Plaintiffs' rights through coercion, in that Defendants placed Plaintiffs in lockdown due to protest activity outside the facility that did not provide any justification for lockdown,  assaulted Plaintiffs and placed them in lockdown without allowing the majority of them to shower, allowing any of the detainees to utilize the eyewash facilities present at the detention facility,  and even restricting their access to water, based on their exercise of their First Amendment rights. Defendants also used excessive force against Plaintiffs in violation of the Fourth and Fourteenth Amendments, both in the initial assault and in denying them the ability to exit the area where the pepper spray was used for weeks and not providing them with a cold shower to clean themselves.  Many of the Plaintiffs were not allowed to shower for several days after the incident, and some of the Plaintiffs were taken to medical and then to solitary confinement in the Restricted Housing unit. The officers' behavior indicated an intent to hurt and punish these civil detainees in retaliation for their peaceful protest, particularly as the facility had been made aware of the illegality of such major uses of force against protesters in the past.

6.  This is not the first time Defendant used highly dangerous pepper spray and chemical agents as a method of punishing peacefully protesting detainees.  Exactly three years prior, on June 12,

2017, GEO officers at Adelanto attacked, pepper sprayed, and beat detainees who were peacefully protesting the conditions of confinement. The federal court found that the question of whether the GEO officers' actions violated the Bane Act was a question for the jury, and the case subsequently settled. Over the course of the COVID-19 pandemic, federal courts found that the GEO Group put detainees at risk of harm, both by neglecting to take precautions against COVID-19 and by actively putting detainees in harm's way through re-detainment in contempt of court. In April 2020, in a case called *Roman v. Wolf*, (No. 2000768-TJH), a federal court ordered the release of detainees at Adelanto, finding that the conditions at Adelanto put detainees at substantial risk of suffering serious harm, and that the management did not take reasonable measures to abate that risk. In October 2020, the federal court in *Roman* found that the population level at Adelanto posed an unreasonable risk to each detainee's safety, and ordered the release of hundreds of detainees. Plaintiffs were detained at Adelanto throughout these especially dangerous periods.

## JURISDICTION AND VENUE

7. This is an action brought in diversity between the Plaintiffs, individually and on behalf of all others similarly situated, and Defendant GEO Group, Inc, wherein jurisdiction lies under 28 U.S.C. § 1332. Plaintiffs seek damages and declaratory relief pursuant to Civ. Code § 52.1 based upon the violations of Plaintiffs' rights under the United States Constitution and under California law. Defendant Geo Group, Inc. is a corporation headquartered in Florida. On information and belief, there were more than 100 detainees being held in the impacted units at Adelanto Detention Facility on that day.

8. Venue is proper in the Central District of California in that the events and conduct complained of herein all occurred in the Central District, and the named Plaintiffs reside in the Central District.

## THE PARTIES

9. Plaintiffs are detainees presently or formerly detained at Adelanto ICE Processing Center in Adelanto, California. Plaintiffs are residents of California.

10. Jose Baca Hernandez was born in Mexico but has lived in the United States since he was three years old. Mr. Baca is blind. At all times relevant to this complaint, Mr. Baca was detained

at Adelanto in unit 3C. He is presently released on bond.  Before the attack, Mr. Baca and the

other detainees in unit 3C were peacefully protesting a lockup by sitting on the ground in front of

their cells. Without warning, fifteen to twenty GEO guards in riot gear sprayed a large cloud of

pepper spray and began shooting pepper bullets indiscriminately at Mr. Baca and other detainees.

The GEO guards knew Mr. Baca was blind because it was indicated on his paperwork, he had an

assigned disability advocate who visited regularly, and he was the only one with glasses.

Nevertheless, the Defendants provided no help to direct Mr. Baca away from the use of force nor

did they speak to him to tell him what was going on; instead, they subjected him to the same

attacks as the rest of the unit.   Following the attach, Mr. Baca repeatedly requested a shower to

wash the pepper spray off, but was not allowed to shower until his last day in the Restricted

Housing Unit.  He was then transferred back to Unit 3C where he and the other detains continued

to be on lockdown and he could still smell the pepper spray around him.

11. Hugo Gonzalez Mejia is a high-risk medical detainee who has chronic leukemia and asthma.

He has been held at Adelanto since March 2020, and the facility is aware of his medical conditions.

He was held in Unit 3C on the day in question.  The facility provided Mr. Gonzalez with inhalers

for his asthma and also with leukemia medication.  On the morning of June 12, 2020, Mr. Gonzalez

was sitting outside the door to his cell, protesting the fact that the facility was placed on lockdown

whenever there were protests outside.   When the guards began firing at him, he shouted "Don't

shoot!  I'm battling cancer!"  But it seemed to him that the guards were actually firing right at him

deliberately, and the pepper balls hit him directly in his chest and head as he sat on the floor with

his head down.

12. On June 12, 2020, Mr. Erick B. Jaimes Lopez was also in Unit 3C.  Without warning, GEO

guards sprayed a large cloud of pepper spray and began shooting pepper bullets indiscriminately at

Mr. Lopez and other detainees.  Mr. Lopez was on the top tier sitting just outside his cell, number

208, in 3C.  Mr. Lopez did not move to get up when the shooting started.  He struggled with his

breathing and threw up repeatedly.   They were shooting around him and the cloud of spray

enveloped him.  A GEO guard also pushed Mr. Lopez into the cell door, causing him bruises.  He

also suffered a coughing fit and chest pains after the attack, and waited hours for medical attention.

At the medical facility he was not given any water nor was he allowed to use an eyewash facility. For several weeks after the attack, Mr. Lopez continued to suffer from chest pains and coughing.

13. Mr. Mario Manjarrez was housed in 3B, also known as 3 Bravo. On June 12, 2020, guards came to the unit around noon and informed everyone to go into their cells because they would be put on lockdown. People sat and lay down on the floor to indicate their refusal to go back into lockdown. The warden came and spoke to Mr. Manjarrez and said there would be consequences if they did not go into their cells. He did not say what the consequences would be. After the warden came in, around twenty GEO guards entered the unit with masks, paintball guns and shields. Mr. Manjarrez was on the second floor in another person's cell making a cup of noodles. Mr. Manjarrez walked down the stairs to go back to his own cell. While he was walking to his cell, the guards shot him in the back twice. After he felt the first pepper ball exploded on his shoulder, Mr. Manjarrez fell to the floor and began crawling to his cell. A pepper ball exploded next to his eye. A vein in his eye burst, turning the whites of his eye completely red for at least a month. After the use of force, the unit was put on lockdown for approximately a month. Mr. Manjarrez found pepper balls that had landed inside his cell, and they kept emitting pepper spray sporadically.

14. Ricardo Sandoval Guardarrama had previously been the victim in a shooting at a mall, and had received a U visa for the victims of crimes. After his visa expired, he was arrested for noncompliance with a diversion program (a charge that was later dismissed. At all times relevant to this complaint, Mr. Sandoval was detained at Adelanto in unit 3D. He is presently released on bond. During the protest, GEO guards in riot gear, with large guns that fired pepper bullets, sprayed a large cloud of pepper spray and began shooting pepper bullets indiscriminately at Mr. Sandoval and other detainees. As a result of the pepper spray in the air, Mr. Sandoval coughed repeatedly and experienced pain in his eyes and nose for the whole night and throughout the next day, his eyes and skin were burning and itching. He remained in pain and itchy until a few days later, around the third day after the attack. Mr. Sandoval also found pepper balls inside his cell, which prolonged the effects of the pepper spray. The pepper guns reminded him of guns he had seen in the shopping center before he was shot. Even though Mr. Sandoval immediately returned to his cell when the guards came in, he was still subjected to the pepper spray, including some

1   clouds from the pepper balls inside his cell.  He did not get effective cleaning materials for his cell

2   until the detainees were allowed out of lockdown and able to get a boom and mom. At that point,

3   he found more pieces of the pepper spray balls.

4   15. Defendant GEO Group, Inc. ("GEO") is a private company headquartered in Boca Raton,

5   Florida which contracts with government entities to provide corrections officers and other

6   detention-related services. GEO Group, Inc. contracts with the federal government to run the

7   Adelanto Detention Facility, which includes providing guards and security personnel and making

8   decisions about whether to change facility procedures when a lockdown occurs outside.

9   16. DOES 1-10 are individuals or corporate entities who are employees, contractors, or agents

10   of the GEO Group, involved in the planning and execution of the major use of force at the facility.

11   **FACTUAL ALLEGATIONS**

12   17. In the spring and summer of 2020, Adelanto Detention Facility had a policy and practice of

13   locking down detainees for days whenever a protest took place outside the facility.  This was not

14   the first time that they had taken away detainees' freedoms due to lawful First Amendment activity

15   by others; previously, the facility had had a policy of blocking numbers of advocates outside the

16   facility when detainees were reporting problems such as lack of medical care.  During the day on

17   Friday, June 12, 2020, GEO officers told Plaintiffs and other detainees in units 3A, 3B, 3C and 3D

18   ("class members") that they would be placed in lockdown and confined to their cells because of a

19   protest that was taking place outside the facility.

20   18. The detainees in units 3A, 3B, 3C, and 3D had been placed in lockdown just the previous

21   week. for roughly three days, despite having been told that it would only last a few hours. At that

22   time, the Class members had only been allowed out for thirty minutes to an hour each day, giving

23   each person only a few minutes to shower.

24   19. Several of the detainees tried to reason with the GEO officers who brought this news by

25   pointing out that the protests were unrelated to them and that they did not affect the safety of anyone

26   within the facility.

27   20. The detainees in Unit 3 (units 3A through 3D) decided to peacefully protest being locked

28   down again due to protests outside the facility.  Some detainees sat down on the floor just outside

their cells while others sat down at the tables in the dayroom or on the floor of the dayroom. The scene in each of the four dayrooms (A through D) was peaceful. Some detainees moved in and out of their cells to get food and attend to other basic needs. The guards told the detainees to go inside their cells to be locked in, but instead the detainees remained sitting peacefully on the floor. They explained to the guards that they were peacefully protesting being locked down again. At some point, the warden came to look in and talk to the detainees. Some of the detainees explained to the warden that this was a peaceful protest of the lockdown at the facility.

21. In the early evening, fifteen to twenty guards dressed in riot gear and armed with large guns that fired pepper balls and pepper spray canisters stormed all four units at Adelanto West sequentially and in each unit immediately started indiscriminately shooting at the Plaintiffs with pepper balls and sprayed them with pepper spray. Neither the warden nor the guards warned the detainees that they were about to use force or chemical sprays and pepper bullets, nor did they give the detainees time to go back to their cells after the guards entered. Instead, they entered rapidly and fired on people as they retreated to their cells, in some instances even firing into the cells. Many detainees were directly struck with pepper balls and with close-range pepper spray, despite the government mandate that detainees should only be pepper-sprayed at a distance. Pepper balls hit detainees in the head as they sat peacefully on the floor and in the torso as they tried to walk to their cells. The entire room was covered in a cloud of pepper spray. For detainees that had experienced trauma in the past, the chaotic scene reminded them of past experiences. These units contained asylum seekers and detainees who had been the victims of crimes.

22. In each unit, even though the detainees were not resisting, the GEO officers continued to shoot at the detainees seated on the floor or returning to their cells, to spray them with pepper spray at close range, and to indiscriminately fire into the cells. Pepper balls hit the detainees, including the named Plaintiffs directly in their chests, backs, heads, and landed on the walls and floor. Upon contact, the pepper balls exploded in white clouds of pepper gas.

23. The detainees were coughing and vomiting, and some even fainted. They felt suffocated and were in severe pain because of the burning sensation on their skin and in their eyes, lungs, and chest.

24. Some of the Plaintiffs tried to alert the GEO officers of their medical conditions like asthma and leukemia, but the officers continued to shoot. Some officers specifically targeted the Plaintiffs trying to alert them to their medical condition.

25. At this time, all of the named plaintiffs were involved in protesting the proposed lockdown. In Unit 3C, Mr. Gonzalez was sitting peacefully and was not near anyone else just before the raid began. The guards came in and counted everyone sitting outside their cells; they were able to do a peaceful count.  Mr. Baca was also sitting just outside his cell in Unit 3C.  Mr. Lopez was on the second floor of the unit, called the "top tier", sitting just outside 208 in 3C.  The detainees were generally sitting on either side of the door of their cells. The facility had a procedure called "out count" which allowed the guards to count the detainees even if they were in the recreation yard or another part of the facility.

26. As the protest continued, suddenly, approximately twenty guards came in in riot gear.  They started off by shooting at the floor, but then began shooting at Mr. Gonzalez' chest.  Mr. Gonzalez became frightened and yelled, "Don't shoot!  I'm battling cancer!"  Mr. Gonzalez put his head down and tried to stay still.  His hands were out so they could see nothing was in them.  But the guards continued to shoot.  Some of the pepper balls hit Mr. Gonzalez in his chest and head as he sat on the floor with his head down.  The guards sprayed detainees at very close range, spraying into their faces.  Mr. Gonzalez immediately found it very difficult to breathe.

27. Mr. Lopez was sitting peacefully outside his cell.  He was shocked and did not move to get up when the shooting of pepper balls started.  He heard Mr. Gonzalez yelling that he could not breathe and that he had cancer.  During the attack, Mr. Lopez struggled with his breathing and threw up repeatedly.  They were shooting around him and the cloud of pepper spray enveloped him.  It was a really strong and burning smell.  He could feel the burning in his eyes and nose, and on his skin.  Then, a GEO guard pushed Mr. Lopez into the cell door causing bruises on his stomach.

28. Mr. Baca lost his eyesight prior to his detention at Adelanto, and the facility was aware of his condition. On June 12, 2020, Mr. Baca was detained in 3C as well, and was sitting peacefully outside the door of his cell. After the attack started, Mr. Baca retreated to his cell. Mr. Baca was attempting to wash the pepper spray off himself in the sink in his cell when the GEO guards closed

the door and locked him in.  Mr. Baca was confused by the situation, could not tell what was
happening, and became frustrated and punched the cell door. His hand started bleeding and his
cellmate called a guard over so Mr. Baca could get medical treatment. After being taken to the
medical unit, Mr. Baca was taken to the Restricted Housing Unit.

29. In Unit 3B, many people were sitting or lying on the floor when the officers came in. Some
hid under the tables. Others started crawling towards their cells to comply with the orders. There
was no time from the time they saw the guards to comply; the guards started shooting pepper balls
before anyone could get to their cells.

30. Mr. Mario Manjarrez was housed in 3 Bravo.  Mr. Manjarrez saw the warden come into the
unit and tell people to go into their cells, and then the warden left again.  A lot of people were sitting
or lying on the floor to indicate that they were continuing to protest.  Mr. Manjarrez was on the
second floor inside another person's cell making a cup of noodles.  Suddenly, around twenty GEO
guards entered the unit with masks, paintball guns and shields. Mr. Manjarrez walked down the
stairs to go back to his own cell.  Mr. Manjarrez had his hands up and his arms raised while walking
down the stairs.

31. While he was walking to his cell, the guards shot him in the back twice.  After he felt the
first pepper ball explode on his shoulder, Mr. Manjarrez fell to the floor and began crawling to his
cell.  A pepper ball exploded next to his eye.  Pepper balls were being fired into his cell, so when
he arrived there it was covered in pepper spray and pepper balls.  As a result of the attack, he
suffered swelling and irritation in his eyes.

32. Ricardo Sandoval Guardarrama was detained at Adelanto in unit 3D.  When the raid on the
unit began, Mr. Sandoval and the other detainees in unit 3D were peacefully protesting by sitting
on the ground in the day room.  Without warning, GEO guards in riot gear sprayed a large cloud of
pepper spray and began shooting pepper bullets and rubber bullets indiscriminately at Mr. Sandoval
and other detainees. When they saw the guards, the detainees immediately started returning to their
cells and the GEO guards started shooting right away, as soon as they came in.   The guards did not
give any warning when they started shooting.  Even though Mr. Sandoval immediately went back
to his cell, he was still subjected to pepper spray, including in a cloud from pepper balls that were

shot directly into his cell.  In Mr. Sandoval's case, as in Mr.Manjarrez's  pepper balls landed inside his cell.  The walls and floor were saturated with pepper spray.

33. Mr. Manjarrez was allowed to shower two to three hours after the shooting, but others were not allowed to shower for as long as three days after the incident. These Plaintiffs had to resort to using sink or toilet water to remove the pepper spray and relieve the burning sensation.

34. As a result of the pepper spray in the air, Mr. Sandoval coughed repeatedly and experienced pain in his eyes and nose for the whole night; throughout the next day, his eyes and nose were watering and itching.  There were 3 or 4 pieces of pepper balls that had landed inside his cell and continued to release smoke for hours; they could smell it very strongly on the second day. His eyes and skin were also burning ad itchy for several days as the pepper ball released smoke hi the cell that he was locked into.  Mr. Sandoval could feel it on his neck and skin.  It was very sensitive, itchy and painful.

35. The detainees were not given cleaning supplies to clean their cells besides toilet paper and paper towels.  Some of the detainees had spare clothing already in their cells, but it too became saturated with pepper spray.  The facility did not provide the detainees with clean changes of clothes.

36. After the incident, Plaintiffs were kept locked in their cells for over a month. They were only allowed out an hour each day. Their showers were limited as well as their phone calls.

37. Because they were not allowed to go shower, they had to bathe themselves with the toilet water.  This was humiliating to Mr. Sandoval.  He also felt the emotions come back from his shooting.  When the officers entered, the pepper guns they carried reminded him of guns he had seen in real life in the shopping center before he was shot.

38. A few detainees were taken to the Restricted Housing Unit, where they were kept in solitary confinement for one or two weeks. Detainees in the Restricted Housing Unit also were not given immediate access to showers and some had to wait at least three days before being able to shower.

39. For days and weeks after the incident, many detainees continued to suffer from a burning sensation on their skin. Many experienced symptoms such as chest pains, coughing, and dizziness for weeks. Plaintiffs were not given any access to fresh air and to the contrary were locked into the

very cells where the pepper spray and balls had been fired without any gloves, rags, or any other cleaning materials.  No one came to clean the cells, although the walls and furniture were saturated with pepper spray.

40. The dayroom in Unit 3C was covered in pepper spray and pepper balls afterwards.  Without access to the showers, people were using the toilet water to clean their bodies and their cells to get relief from the burning.  They were not given anything to clean themselves or their cells with except paper towels and toothpaste.  The detainees had to clean the walls and the cell themselves.  It took weeks to clean the cell to the point where the detainees were not feeling the effects of the pepper spray anymore.

41. Mr. Gonzalez asked to go to the medical facility, where a nurse checked his vitals and gave him a change of clothes, but did not do anything else for him. Mr. Gonzalez was not given access to the eyewash facility even though when he went to medical his eyes were burning and red.  He experienced pain in his eyes throughout the day. He was not allowed to shower for a couple days. He had trouble breathing in the shower when he finally could shower; the water was frequently too hot in the shower.  It was not possible to take a cold shower in that shower.  For several weeks, the pepper would linger in their cells and in the day room.  During this time, Mr. Gonzalez' asthma was affecting him greatly.

42. When Mr. Baca came back from the RHU, he could smell and feel that it was still covered in pepper spray.  He was cleaning with napkins, because he was not given cleaning supplies.  He continued to experience itching and burning on his skin because the room was not clean.  He was locked into this cell for weeks.

43. After the attack, Mr. Lopez suffered a coughing fit and chest pains. Mr. Lopez waited hours for medical attention and was finally briefly seen by the staff. At the medical facility he was not given any water nor was he allowed to use an eyewash facility.  For several weeks after the attack, Mr. Lopez continued to suffer from chest pains and coughing.  After that, his unit was held in lockdown for about a month.

44. When a pepper ball exploded near Mr. Manjarrez's eye, a vein in his eye burst, turning the whites of his eye completely red for at least a month.  Mr. Manjarrez's skin burned for at least a

week following the attack.  A year after the attack, his eye remained red and swollen and he continued to need eyedrops.  After the use of force, the unit was put on lockdown for approximately a month.

45. Mr. Sandoval was not offered a shower, medical care, or a change of clothes after the attack. He wasn't able to shower until a few days later, around the third day after the attack. Mr. Sandoval and the other detainees in unit 3D were also held in lockdown for several weeks after the attack. The cloud of pepper spray lasted through the next day. At night the detainees in Mr. Sandoval's cell were trying to breathe through their blankets to avoid breathing it in, unable to sleep.  When they were finally allowed to leave their cells and retrieve cleaning supplies such as a broom, days later, they found more pieces of pepper balls inside their cell as they cleaned.

46. Because they were not allowed to go shower, they had to bathe themselves with the toilet water.  This was humiliating to Mr. Sandoval.  He also felt the emotions come back from the time he had been shot in a shooting at a shopping center.  When the officers entered, the large pepper bullet guns they carried reminded him of guns he had seen in real life in the shopping center before he was shot.

47. Only after two weeks were the detainees finally allowed out of their cells to fully clean their cells and remove remnants of the pepper balls; and the lockdown continued for several weeks to a month in each of the units. The detainees were required to clean the dayroom themselves.  The mops were full of pepper-spray.  The remnants of the pepper spray were still there, and it choked people while they were cleaning their cells and the dayroom.  The remaining residue of the pepper balls and spray that remained on surfaces continued to reactivate every time water was applied for cleaning or disinfectant spray was sprayed. GEO did not respond to Plaintiffs' complaints about the need to decontaminate the surfaces.

48. As a result of the GEO Group's indiscriminate use of pepper spray, the detainees on this floor were injured not just at the time of the incident but for the subsequent several days as their access to water was restricted and they were not provided with cold showers or eyewash facilities. The dayrooms were not adequately cleaned, nor were they given adequate cleaning supplies or even gloves and rags with which to clean.  Their skin continued to burn and pain them for weeks, and

1    multiple detainees suffered from nausea, chest pains, and coughing, as well as effects on their eye

2    and nose.  They were also subjected to a lockdown and kept in their cells for 23.5 hours a day for

3    approximately a month.

4                                    **CLASS ACTION ALLEGATIONS**

5         49. Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs bring this action on

6    behalf of themselves and the Class, which is composed of incarcerated persons held on the Third

7    Floor of the East Facility, on June 12, 2020, in the following units: 3A, 3B, 3C, and 3D.

8         50. Plaintiffs, on behalf of themselves and the class of similarly situated persons, seek

9    certification of claims for declaratory and injunctive relief for violations of the First, Fourth, Fifth,

10   and Fourteenth Amendments to the United States Constitution.

11        51. Plaintiffs also seek certification of claims against Defendants for declaratory relief and for

12   restitution pursuant to California Tort Law (Cal. Civ. Code § 3294).

13        52. Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated,

14   pursuant to Federal Rule of Civil Procedure 23 (b)(3).  Plaintiffs seek certification of a class defined

15   as follows:

16            All immigration detainees housed at Adelanto Detention Facilities Units 3A, 3B, 3C, or 3D,

17            who were either 1) subjected to the use of pepper spray or other chemical force or other

18            physical force that day; 2) denied or restricted from showers, eyewash facilities, or medical

19            care after that use of force; and/or 3) were placed on lockdown continually for some period

20            of time after June 12,2020.

21        53. This action is brought as a class action and may properly be so maintained pursuant to the

22   provisions of Federal Rule of Civil Procedure 23. Plaintiff reserves the right to modify the Class

23   definitions and the class period pursuant to discovery to be conducted hereafter.

24        54. **Numerosity of the Class.** Members of the Class are so numerous that their individual

25   joinder is impractical.  The Class encompasses all residents of four units on the 3rd section of the

26   West Building: 3A, 3B, 3C, and 3D.  On information and belief, there were more than 100 detainees

27   housed in those units on June 12, 2020.  The precise identities, numbers and addresses of members

28   of the Class are unknown to the Plaintiffs but may and should be known with proper and full

                                                    14

discovery of Defendant, third parties, and their respective records.

55. **Existence of Common Questions of Fact and Law.** Plaintiffs are informed and believe, and thereupon allege, that there is a well-defined commonality and community of interest in the questions of fact and law involved affecting the members of the Class. The common questions of fact and law include:

a) Whether Defendants used pepper spray and chemical agents to retaliate against the Plaintiff class and chill their freedom of speech and association in violation of the First Amendment;

b) Whether Defendants violated Plaintiffs' rights to be free from excessive or arbitrary force, and segregated detention, without reasonable or probable cause under the Fourth Amendment to the United States Constitution;

c) Whether Defendants' conduct deprived Plaintiffs of liberty without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution;

d) Whether Defendants should be enjoined from continuing to use these weapons indiscriminately, for purposes of crowd dispersal.

56. **Typicality.** Plaintiffs' claims are typical of the class they seek to represent because at the time the use of force was initiated, Plaintiffs and the Class were behaving in similar ways—peacefully refusing to return to their cells while engaging in peaceful daytime activities in the day room or sitting peacefully in front of their cells. Plaintiffs and the Class were all subjected to excessive force while being shot at or injured by pepper spray and chemical agents intended to prevent them from exercising their right to peacefully protest. Plaintiffs have the same interests and have similarly suffered harm arising from Defendant's violations of law as alleged herein.

57. The Warden of the facility, a GEO group employee, was aware of the peaceful protest and spoke with some of the detainees who were protesting. Plaintiffs are informed and believe that GEO Group approved of and instructed its employees to conduct an indiscriminate use of force and the punitive detention of detainees in the pepper saturated cells without providing cleaning in the cells, and without allowing the majority of them to shower for several days. GEO Group knew this was an excessive use of force against these detainees and deliberately encouraged it to occur in the

same way against all of the class members.

58. **Adequacy.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the classes it seeks to represent. The named Plaintiffs are represented by counsel who are well experienced in civil rights and class action litigation, particularly that concerning the use of force against peaceful protesters, and are familiar with the issues in this case. The named Plaintiffs have a strong interest in achieving the relief requested in this complaint for all class members.

59. **Predominance and Superiority.** This suit may also be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the classes and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution, especially given the complexity and extensiveness of the litigation, and thus would be insufficient to proscribe Defendant's conduct and practices. Additionally, effective redress for each and every class member against Defendant may be limited or even impossible where serial, duplicitous, or concurrent litigation occurs on these disputes. Individualized litigation may lead to incongruous and conflicting judgments against Defendant. To the contrary, a class action procedure involving all Plaintiffs, Defendant and the court present fewer management difficulties, and provide the benefit of a single adjudication, economy of scale, and judicial efficiency and fairness.

60. In accordance with Federal Rules of Civil Procedure, Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class.

61. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them

62. Plaintiffs do not know the identities of most class members. Plaintiffs are informed and

1  believe, and thereon allege, that the identities of the class members are ascertainable in significant

2  part from GEO Group records, as there should be records concerning which detainees were housed

3  in the units on that day. Plaintiffs are informed and believe, and thereon allege, that a significant

4  number of class members may be reached by the use of outreach efforts by coalitions organizing

5  previous detainees from the facility as well as through their immigration lawyers.

6  **FIRST CAUSE OF ACTION**

7  **BATTERY**

8  **(AGAINST DEFENDANT GEO GROUP AND DOES 1-10)**

9  63. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as

10  though fully set forth herein.

11  64. Without consent or legal privilege, Defendant GEO Group's employees intentionally

12  assaulted and physically battered Plaintiffs and class members with the intent to harm Plaintiffs and

13  class members. Such conduct was extreme and outrageous and would be deemed highly offensive

14  to a reasonable person. DOES 1-10, although currently unknown, are employees and agents and

15  contractors of GEO Group that participated in such conduct.

16  65. As a result of the aforementioned conduct, Plaintiffs and class members were physically

17  and psychologically damaged.

18  66. Defendant GEO Group's guards were at all times acting as employees of GEO Group and

19  within the scope of their employment when they harmed Plaintiffs and class members. Defendant

20  GEO Group is responsible for the wrongful conduct of its employees under the law of vicarious

21  liability, including the doctrine of respondeat superior.

22  67. Defendant GEO Group's guards, and DOES 1-10, acted with malice and oppression and

23  with a conscious disregard of Plaintiffs and class members' rights, making all Defendants liable for

24  punitive damages under California Civil Code § 3294.

25  //

26  //

27  //

28  //

**SECOND CAUSE OF ACTION**

**ASSAULT**

**(AGAINST DEFENDANT GEO GROUP AND DOES 1-10)**

68. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

69. Without consent or legal privilege, GEO Group employees created a reasonable apprehension in Plaintiffs and class members of immediate harmful or offensive contact. DOES 1-10, although currently unknown, are employees and agents and contractors of GEO Group that participated in such conduct.

70. As a result of the aforementioned conduct, Plaintiffs and class members were physically and psychologically damaged.

71. Defendant GEO Group's guards were at all times acting as employees of GEO Group and within the scope of their employment when they harmed Plaintiffs and class members. Defendant GEO Group, and DOES 1-10, are responsible for the wrongful conduct of its employees under the law of vicarious liability, including the doctrine of respondeat superior.

72. Defendant GEO Group's guards acted with malice and oppression and with a conscious disregard of Plaintiffs and class members' rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

**THIRD CAUSE OF ACTION**

**NEGLIGENT HIRING, TRAINING, AND SUPERVISION**

**(AGAINST DEFENDANT GEO GROUPAND DOES 1-10)**

73. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

74. Defendant GEO Group negligently hired, retained, and supervised its guards at the Adelanto facility. Despite being on notice that the GEO Group's employees and agents had previously used excessive force against peaceful protesters and had not provided them with adequate showers and eyewash facilities, GEO Group failed to remedy the training and supervision of these employees.

1    DOES 1-10, although currently unknown, are employees and agents and contractors of GEO Group

2    that participated in such conduct.

3    75. Defendant GEO Group's guards intended to cause, and did cause, Plaintiffs and class

4    members to experience severe physical injury and emotional distress and they each acted with

5    reckless disregard of the probability that Plaintiffs would suffer such injuries.

6    76. Defendant GEO Group's guards' conduct was a substantial factor in causing Plaintiffs and

7    class members' severe distress.

8    77. Defendant GEO Group's guards were at all times acting as employees of GEO Group and

9    within the scope of their employment when they harmed Plaintiffs and class members. Defendant

10   GEO Group is responsible for the wrongful conduct of its employees under the law of vicarious

11   liability, including the doctrine of respondeat superior.

12   78. Defendant GEO Group's guards acted with malice and oppression and with a conscious

13   disregard of Plaintiffs and class members' rights, making Defendant GEO Group liable for punitive

14   damages under California Civil Code § 3294.

15                                  **FOURTH CAUSE OF ACTION**

16                     **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

17                     **(AGAINST DEFENDANT GEO GROUP AND DOES 1-10)**

18   79. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as

19   though fully set forth herein.

20   80. The GEO Group and DOES 1–10 engaged in extreme and outrageous conduct that

21   transcended the bounds of human decency.

22   81. Defendant GEO Group's employees, and Defendants DOES 1–10, intended to cause, and

23   did cause, Plaintiffs and class members to experience severe physical injury and emotional distress

24   and they each acted with reckless disregard of the probability that Plaintiffs would suffer such

25   injuries.

26   82. Defendant GEO Group's employees, and Defendants DOES 1–10, conduct was a

27   substantial factor in causing Plaintiffs and class members' severe distress.

28

                                                19

83. Defendant GEO Group's employees, and Defendants DOES 1–10, were at all times acting as employees of GEO Group and within the scope of their employment when they harmed Plaintiffs and class members. Defendant GEO Group is responsible for the wrongful conduct of its employees under the law of vicarious liability, including the doctrine of respondeat superior.

84. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

85. Defendant GEO Group's employees, and Defendants DOES 1–10, acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

## FIFTH CAUSE OF ACTION

## NEGLIGENCE AND FAILURE TO PROVIDE MEDICAL CARE

## (AGAINST DEFENDANT GEO GROUP AND DOES 1-10)

86. Defendants owed a duty of care toward Plaintiffs and were required to use reasonable diligence to ensure Plaintiffs' safety while in their custody and control. Defendants' actions and omissions were negligent and reckless, including but not limited to:

   a) The failure to properly assess the need to use force against Plaintiffs and class members;

   b) The failure to remedy the aftereffects of the pepper spray through common sense measures like provision of cold showers and eyewash facilities;

   c) the negligent failure to clean the pepper spray and balls from the area where Plaintiffs and class members were held for the next several weeks without the ability to leave the area;

   d) the failure to allow Plaintiffs and class members to move from the area until it was cleaned, as had happened in other uses of force at the facility.

87. As a result of Defendants' unlawful conduct, Plaintiffs and class members suffered severe damages, including physical injury and emotional distress.

88. Defendant GEO Group's guards, and DOES 1-10, acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

**SIXTH CAUSE OF ACTION**

**INTERFERENCE WITH CIVIL RIGHTS IN VIOLATION OF THE BANE ACT**

**(CAL. CIV. CODE, § 52.1)**

**FIRST, FOURTH, AND FIFTH AMENDMENTS AND CALIFORNIA STATE**

**CONSTITUTIONAL RIGHTS**

**(AGAINST DEFENDANT GEO GROUP)**

89.  Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

90. Civil Code section 52.1, the Bane Act, provides that it is unlawful to interfere with the exercise or enjoyment of any rights under the Constitution and laws of this state and the United States by use or attempted use of threats, intimidation, or coercion. Defendant GEO Group and Does 1-10 intended to deprive and did deprive Plaintiffs and class members of the equal protection of the laws and of equal privileges and immunities of the laws of the United States because of Plaintiffs and class members' exercise of their Constitutional rights.  The GEO Group, and DOES 1-10, acted with reckless disregard of Plaintiffs and class members' constitutional rights.

91. Defendants violated Plaintiffs and class members' rights to freedom of expression and assembly without reasonable or probable cause under the First Amendment to the United States Constitution, and Article 1 Sections 2 and 3 of the California Constitution.  Defendants both repeatedly locked down Plaintiffs and class members in response to the exercise of other people's constitutional rights, and used excessive force amounting to a major use of force in response to Plaintiffs and class members' peaceful protest.  These civil detainees had the right to petition and protest regarding the deprivation of their due process rights by repeatedly locking them in their cells for 23.5 hours a day with no justification.

92. Defendants violated Plaintiffs and class members' rights to be free from excessive or arbitrary force, and punitive detention without reasonable or probable cause under the Fourth and Fifth Amendments to the United States Constitution and under Article I section 7 of the California Constitution. Defendant GEO's guards assaulted Plaintiffs and placed them in lockdown for several weeks without legal authority.

93. Defendants' guards' conduct deprived Plaintiffs and class members of liberty without due process of law under the Fifth Amendment to the United States Constitution and Article I section 7 of the California Constitution.  Based on protests occurring outside the Adelanto facility that were completely unrelated to Plaintiffs and class members, Defendants assaulted Plaintiffs and class members and repeatedly placed them in lockdown all without legal authority.  Defendants denied Plaintiffs and class members the equal protection of the law and used excessive force against them.

94. To the extent that Defendants assert that punitive action was necessary against these civil detainees for breaking the rules or refusing to comply with orders, Defendants also specifically intended to interfere with Plaintiffs and class members' rights under California Constitution Article I section 17.

95. As a result of Defendant's guards unlawful conduct, Plaintiffs and class members suffered severe physical and emotional distress.

96. Defendants GEO and DOES 1-10 knew or should have known that assaulting Plaintiffs and class members, placing them in lockdown, and not allowing them to shower or clean the pepper spray from their bodies and their cells in response to the detainees' non-violent actions was a violation of Plaintiffs and class members' constitutional rights.  Defendants knew or should have known that this was a violation of Plaintiffs and class members' rights, including the right to be free of excessive force, based on previous actions and investigations in the facility.

97. Defendant GEO's guards acted with malice, oppression, and with a conscious disregard of Plaintiffs and class members' rights, making Defendant liable for punitive damages under California Civil Code §3294.

//

//

//

**PRAYER FOR RELIEF**

98. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs.

**WHEREFORE**, Plaintiffs seek judgment as follows:

1.  An order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure, Rule 23(b)(3);

2.  General and compensatory damages for Plaintiffs and the class they represent for the violations of their rights, in addition to pain and suffering, all to be determined according to proof;

3.  Punitive damages pursuant to Civ. Code § 52, subd. (b)(1);

4.  Reasonable attorney fees according to proof, pursuant to Civil Code §§ 52(b) & 52.1(h) and Code Civ. Proc. § 1021.5;

5.  Cost of suit; and

6.  Such other relief as the court deems just and proper.

Dated: June 10, 2022                    Respectfully submitted,

                                        By: /s/ Catherine E. Sweetser
                                        Catherine E. Sweetser
                                        Rie Ohta
                                        UCLA LAW CLINICS

                                        Paul Hoffman
                                        John Washington
                                        SCHONBRUN SEPLOW HARRIS
                                        HOFFMAN & ZELDES LLP

                                        *Attorneys for Plaintiffs and Proposed Class.*

1 | **DEMAND FOR JURY TRIAL**

2 | Plaintiffs hereby make a demand for a jury trial in this action.

3

4 | Dated: June 10, 2022                         Respectfully submitted,

5

6 | By: /s/ Catherine E. Sweetser
Catherine E. Sweetser
Rie Ohta
7 | UCLA LAW CLINICS

8 | Paul Hoffman
John Washington
9 | SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
10

11 | *Attorneys for Plaintiffs and Proposed Class.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28