ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
JOSEPH MCGEADY (BAR NO. 308408)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone: (619) 233-1155 Fax: (619) 233-1158
E-Mail: jmcgeady@allenmatkins.com

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
MATTHEW T. SESSIONS (BAR NO. 307098)
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone: (949) 553-1313 Fax: (949) 553-8354
E-Mail: msessions@allenmatkins.com

BURKE, WILLIAMS & SORENSON, LLP
SUSAN E. COLEMAN (BAR NO. 171832)
444 South Flower Street, Suite 2400
Los Angeles, California 90071-2953
Phone: (213) 236-0600 Fax: (213) 236-2700
E-Mail: scoleman@bwslaw.com

Attorneys for Defendant
THE GEO GROUP, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE GEO GROUP, INC., et al.,<br><br>Defendants. | Case No. 2:22-cv-04014-JGB-ACCV<br><br>[CLASS ACTION]<br><br>Honorable Jesus G. Bernal<br><br>**DECLARATION OF MATTHEW SESSIONS IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE NO. 1 TO EXCLUDE REFERENCE TO UNRELATED ALLEGED USES OF FORCE**<br><br>Date: August 31, 2026<br>Time: 11:00 a.m.<br>Ctrm: 1<br><br>Date Action Filed: June 10, 2022<br>Trial Date: Oct. 6, 2026 |

# DECLARATION OF MATTHEW T. SESSIONS

I, Matthew T. Sessions, declare as follows:

1. I am an attorney at the law firm of Allen Matkins Leck Gamble Mallory & Natsis LLP, counsel of record for The Geo Group, Inc. in the above-captioned action. I am a member in good standing of the State Bar of California and have been admitted to practice before this Court. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. On June 10, 2022, Plaintiffs Hugo Gonzalez, Jose Baca, Erick Lopez, Mario Manjarrez, and Ricardo Sandoval Guadarrama filed their Complaint, on behalf of themselves and all others similarly situated, alleging claims for (1) battery, (2) assault, (3) negligent hiring, training, and supervision, (4) intentional infliction of emotional distress, (5) negligence and failure to provide medical care, and (6) interference of civil rights.

3. On April 19, 2024, Quincy Williams was deposed in the above captioned action. Attached as **Exhibit A** is a true and correct copy of the excerpted and highlighted transcript from Mr. William's deposition.

4. On May 28, 2024, Regina Duran was deposed in the above captioned action. Attached as **Exhibit B** is a true and correct copy of the excerpted and highlighted transcript from Ms. Duran's deposition.

5. On June 12, 2024, Kenneth Reveteriano was deposed in the above captioned action. Attached as **Exhibit C** is a true and correct copy of the excerpted and highlighted transcript from Mr. Reveteriano's deposition.

6. On July 1, 2024, Albaro Albanes was deposed in the above captioned action. Attached as **Exhibit D** is a true and correct copy of the excerpted and highlighted transcript from Mr. Albanes's deposition.

7. On July 24, 2024, James Janecka was deposed in the above captioned action. Attached as **Exhibit E** is a true and correct copy of the excerpted and highlighted transcript from Mr. Janecka's deposition.

8. On August 6, 2024, Joshua Johnson was deposed in the above captioned action for the first time. Attached as **Exhibit F** is a true and correct copy of the excerpted and highlighted transcript from Mr. Johnson's deposition, Volume 1.

9. On August 8, 2024, Joshua Johnson was deposed in the above captioned action for the second time. Attached as **Exhibit G** is a true and correct copy of the excerpted and highlighted transcript from Mr. Johnson's deposition, Volume 2.

10. On July 20, 2026, the parties exchanged their proposed joint exhibit lists. Attached as **Exhibit H** is a true and correct copy of the document referenced on Plaintiffs' proposed exhibit list as exhibits 6 and 10.

11. On July 27, 2026, Defendant's counsel met and conferred with Plaintiffs' counsel by Zoom regarding the subject matter of this Motion in Limine. The parties were unable to reach a resolution regarding this motion. Attached as **Exhibit I** is a true and correct copy of correspondence from Defendant's counsel to Plaintiffs' counsel dated July 27, 2026 regarding Defendant's motions in limine.

12. On July 31, 2026, Defendant transmitted to Plaintiffs' counsel a version of their exhibits 6 and 10 with highlights indicating proposed redactions. Attached as **Exhibit J** is a true and correct copy of the highlighted exhibit transmitted on July 31, 2026. Plaintiffs have not agreed to the proposed redactions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 3, 2026, at Irvine, California.

*/s/ Matthew T. Sessions*
Matthew T. Sessions

# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

______________________________
)
HUGO GONZALEZ, JOSE BACA, )
ERICK LOPEZ, MARIO MANJARREZ,)
and RICARDO SANDOVAL )
GUADARRAMA, on behalf of )
themselves and all others )
similarly situated, )
)
Plaintiffs, )
)
vs. ) No. 2:22-cv-04014-JGB-SHK
)
The GEO Group, Inc., a )
Florida corporation, DOES )
1-10, )
)
Defendants. )
______________________________)

REMOTE DEPOSITION OF QUINCY L. WILLIAMS
Adelanto, California
Friday, April 19, 2024
Volume I

Reported by:
SHARON LINDSAY-MILNIKEL
CSR No. 5335
Job No. 6663651

PAGES 1 - 193

agents.
A Yes.
Q And what's your training on decontaminating areas after chemical agents were used?
A Clean the area that was saturated.
Q How are you trained to clean the area that was saturated?
A Oh, like sweep, mop, use a rag.
Q Any other ways to clean the area that you were trained?
A No, I don't know.
Q Have you assisted with decontaminating areas after use of chemical agents at Adelanto?
A Yes.
Q How many times?
A Three times.
Q Was one of those times on June 12th, 2020?
A I don't recall.
Q Can you tell me about the first time you assisted with decontamination at Adelanto?
A I cleaned 4 Bravo.
Q Do you recall the approximate month or year that this occurred?
A 2015.

Q Do you recall why chemical agents were used in that instance?
MS. RIVARD: Objection. Speculation, foundation.
BY MS. SHANBHAG:
Q Go ahead.
A Can you repeat your question?
Q Yes.
Do you recall why chemical agents were used in that instance?
MS. RIVARD: Objection. Speculation, foundation.
BY MS. SHANBHAG:
Q Go ahead.
A Yes.
Q Why were they used?
A Why we used pepper spray on the incident --
Q Yes.
A -- is that what you're asking?
Q Uh-huh.
A The individuals were refusing to return to their cells and were intoxicated and very aggressive towards us staff.
Q When you say "we used pepper spray," did

you use pepper spray on that occasion in 2015?
A Oh, no, ma'am. No, ma'am, I did not.
Q What was your involvement in that use of force incident in 2015?
A My involvement of the use of force in 2015?
Q Yes.
A I was to assist with separating the individuals that are intoxicated and to secure them in handcuffs, mechanical restraints, and to take them to medical to have them evaluated because they were intoxicated and to search and seize all weapons that they had.
Q And then you decontaminated?
A Oh, yes, we decontaminated prior to going to medical -- or before they left the unit, they were decontaminated.
Q And how did you help them to decontaminate in that instance?
A We took them to the shower.
Q What about the second time that you assisted with decontamination, when was that?
A Roughly 2018, January-ish. I can't give you like an exact date. I just know it was 2018 about.

Q That's fine. And I appreciate you trying.
Are you familiar with the circumstances leading to the use of chemical agents in that instance?
A Oh, yes, yes.
Q Okay. Can you tell me why force -- let me withdraw that.
Can you tell me why chemical agents were used in January 2018?
A The individuals were refusing to return to their housing unit from the rec yard and they had weapons and drugs. And they refused to comply with the pat-down search and to return to the unit.
Q What was your involvement in that use of force?
A Assisting with placing mechanical restraints.
Q Did you use force?
A Yes.
Q What force did you use?
A Minimal force necessary to gain compliance for the safety and security of the facility.
Q Did you use restraints?
A Handcuffs, yes.
Q Anything else?

A No.
Q And in that instance, when were the detainees decontaminated?
A Immediately after being sprayed, within minutes.
Q And how did you allow them to decontaminate?
A Showers.
Q And you said you decontaminated three times -- correct -- so when was the third time?
A The third time was I believe medical. I don't remember the actual date and year of that but there was a little incident that happened in medical.
Q Was it after the January 2018 incident?
A It might have been prior or shortly after that, I believe.
Q And what was the incident in medical that required decontamination?
A The individual was refusing to go to a psychiatric ward outside of the facility so -- and he was being very aggressive and dangerous towards us staff so that's why.
Q What was your involvement in this use of force?

A I believe I held a door open.
Q Was this individual the only person who was pepper sprayed?
A Yes.
Q And you assisted him in decontaminating?
A No, I did not.
Q What was your role in decontamination in this medical incident?
A Excuse me?
Q What was your role in decontamination in this incident?
A Holding the door open.
Q I apologize. I thought you said you assisted with decontamination three times.
A Well, I held the door open for them to take him into the shower.
Q Okay.
A That was my role.
Q Okay. Have you ever assisted with decontaminating an area that was saturated with pepper spray at Adelanto?
A Those three occasions I just gave you, ma'am.
Q And what did the decontamination involve, like what did you do to decontaminate?

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath;

That a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;

That the foregoing transcript is a true record of the testimony given;

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript ( ) was (X) was not requested;

That if the foregoing proceedings were reported stenographically remote from the witness and parties, the transcript of the proceedings reflects the record that I could hear and understand to the best of my ability;

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any party to this action.

//

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 5/1/24

SHARON LINDSAY-MILNIKEL
CSR No. 5335

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
---oOo---

HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE GEO GROUP, INC., a Florida Corporation; DOES 1-10,

Defendants.
_________________________________/

No. 2:22-cv-04014-JGB-SHK

REMOTE DEPOSITION OF REGINA DURAN

Taken before CATHLEEN M. MEUTER
CSR No. 12950
May 28, 2024

A. Probably was within five minutes.
Q. Other than as part of the CERT training, how many times have you been pepper sprayed?
A. Voluntarily?
Q. Just in general, voluntarily, non voluntarily.
A. Three times.
Q. Can you tell me the circumstances of the first time?
A. The first time was for CERT.
Q. And what about the second time?
A. The second time all lieutenants had to be sprayed when they became lieutenants.
Q. Was it part of a training?
A. It was part of your qualification for lieutenant.
Q. And where on your body were you sprayed on that second occasion?
A. The same, on the forehead above the eyes.
Q. Did you experience the same burning sensation?
A. Yes.
Q. How did you relieve the pain on that occasion?
A. The same, wash off with water.
Q. And what was the third time that you were pepper sprayed? Can you tell me about those circumstances?

A. That time I just got kickback from spraying somebody.

Q. So you had sprayed someone, and some of it went into your face.

A. Yeah.

Q. Do you recall when that was?

A. It was either 2018 or 2019.

Q. Were you spraying a detainee?

A. Yes.

Q. Why were you spraying the detainee?

A. That detainee was sprayed because he kept kicking at officers and was not complying to my verbal commands to stop kicking. And after several attempts of him kicking at staff, I then sprayed him after giving him several commands not to.

Q. Do you recall which type of pepper spray you used?

A. Brand or size or --

Q. Both.

A. I don't remember the brand. But it was an MK4.

Q. Other than this one instance in 2018 or 2019 where you sprayed the detainee, how many times have you used pepper spray while on duty at Adelanto?

A. None.

Q. Just once.

A. Just once.
Q. And prior to using the pepper spray on this detainee in 2018 or 2019, did you have to obtain authorization from someone?
A. No.
MS. RIVARD: Objection. Vague as to time. Ambiguous. Assumes facts. And foundation.
BY MS. SHANBHAG:
Q. Going back to the 2018, 2019 pepper spray incident, do you recall whether the detainee received medical assistance after he was pepper sprayed?
A. Yes.
Q. And what is that knowledge based on?
A. We were in medical at the time it happened. So medical -- the nurses were around to assist.
Q. Did you require any medical assistance after using the pepper spray on the detainee?
A. I had to rinse off my face. That was it. I did get kicked. But I didn't realize it until the next day.
Q. But you needed to wash your eyes out.
A. Yes.
Q. And can you just tell me how the pepper spray affected you even though you sprayed it on the detainee? Is that right?

REPORTER'S CERTIFICATE

I, CATHLEEN M. MEUTER, a Shorthand Reporter, State of California, do hereby certify:

That REGINA DURAN, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 10th day of June 2024.

Cathy Meuter

CATHLEEN M MEUTER, CSR NO. 12950
State of California

# Exhibit C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

________________________________

HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE GEO GROUP, INC., a Florida corporation, DOES 1-10,

Defendants.

Case No. 2:22-cv-04014-JGB-SHK

________________________________

VIDEOCONFERENCE DEPOSITION OF

KENNETH REVETERIANO

DATE: Wednesday, June 12, 2024

TIME: 10:03 a.m.

LOCATION: Remote Proceeding
Adelanto ICE Processing Center
10400 Rancho Road Adelanto
Adelanto, CA 92301

OFFICIATED BY: Lily Simitian

JOB NO.: 6726460

A Is there a time period or just in general?
Q During your employment with GEO.
A Okay. I -- I couldn't give you a good number.
Q An estimate is fine.
A Approximately 15, 20.
Q And on any of those occasions, were you the one to deploy pepper spray?
A Yes.
Q How many occasions did you deploy pepper spray?
A Once.
Q Can you tell me about the circumstances of that incident?
A Yes.
Q Go ahead.
A This was probably ten years ago, so it's been a while. A detainee was refusing to -- refusing to move out of a area of the facility and to gain compliance, we had a team come in and -- with OC to be used so no one got injured.
Q Do you recall what area of the facility that this detainee was not moving from?
A Yes.
Q Which part?
A Intake.

Q And why did he need to be moved?
A To go back to housing.
Q And you mentioned a team coming in with OC spray?
A No. I -- we had a team, and I was the one with the OC spray.
Q How big was the team?
A Five staff members.
Q And somebody assigned you this OC spray?
A Did someone assign me the OC spray?
Q Yes.
A No.
Q Where did you spray the detainee? On which part of his body? His or her body?
A I sprayed him in the eyes or face.
Q Do you recall how many times you sprayed him?
A Yes.
Q How many?
A Once.
Q And what happened after you sprayed him?
MS. RIVARD: Objection. Vague.
A What time at?
Q Immediately after you sprayed him.
MS. RIVARD: Objection. Vague. As to who, what happened.

MS. SHANBHAG: Do you understand the question, Chief?

THE WITNESS: No.

BY MS. SHANBHAG:

Q What did the detainee do after you sprayed him?

A We escorted -- as in the -- the team of five -- the five-man team escorted him to the shower to get decontaminated.

Q What did you do after that?

A After --

MS. RIVARD: Objection. Vague as to with whom.

MS. SHANBHAG: Go ahead.

THE WITNESS: Are you speaking about the same detainee, what happened right after that one? We got him decontaminated and then medical -- medical assessed him. We got him -- as in our -- my staff got him new clothing and then he was placed in SMU.

BY MS. SHANBHAG:

Q And for the record, can you tell me what "SMU" is?

A Yes. It is segregation housing unit.

Q Why was he placed under --

A Sorry.

A I didn't speak to the detainees in 2 Bravo.
Q That's correct. The next sentence says you spoke to detainees in the vestibule.
Can you tell me where the vestibule is?
A Yes. It's -- it's basically a open area outside of the unit.
Q And was it your understanding that the five detainees were housed in West 2 Bravo?
A Yes.
Q Other than yourself, were there any other GEO staff present during this discussion in the vestibule?
A I don't remember.
Q Were you speaking to the detainees in English?
A Yes.
Q Did the detainees speak English to you?
A Yes.
Q And the second to last sentence in the paragraph states, "I gave the detainees until 1300 hours so they had time to shower if needed and then comply to the orders."
Did you need authority to give the detainees additional time to comply with the lockdown?
A At that time, I don't remember if I did or not.
Q Do you recall considering at this point any

alternatives to the facility lockdown?
A Yes. Those were what was given as alternatives.
Q What was the alternative?
A The extra time to comply.
Q I'm talking about an alternative to the facility lockdown itself.
A No.
Q And when you were speaking with the detainees, can you describe their demeanor?
A Their -- the detainees that I talked to were calm as myself and -- and I asked about the reasons, and they explained them. And they understood what I was asking for. And that was it.
Q And according to your memo, this conversation was a little over ten minutes; is that right?
A Yes. According to the memo. Yep.
Q And then going to the paragraph starting with "The captains again spoke with multiple units and gave another directive to comply by 1500 hours, and we would attempt to modified lockdowns so the detainees would have access to the dayroom a cell at a time."
Did you need to obtain authorization to offer this modified lockdown?
A I believe so.

CERTIFICATE OF DEPOSITION OFFICER

I, LILY SIMITIAN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

LILY SIMITIAN
Notary Public in and for the
State of California

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, ANITA CURNETT, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



ANITA CURNETT

# Exhibit D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_______________________________

HUGO GONZALEZ, et al.,

Plaintiffs,

v. Case No.

THE GEO GROUP, INC., et al., 2:22-cv-04014-JGB-SHK

Defendants.

_______________________________

VIDEOCONFERENCE DEPOSITION OF

ALBARO ALBANES, JR.

DATE: Monday, July 1, 2024

TIME: 10:07 a.m.

LOCATION: Remote Proceeding

Adelanto, CA 92301

OFFICIATED BY:

ERIN NICKELS

JOB NO.: 6778351

PAGES 1 - 305

PAGES 19-30, 40-41, 48-48, 58-92 ARE CONFIDENTIAL

Q Okay. I just want to make sure I have the terminology right. You just described two different types of uses of force. Is the first one you described a calculated use of force?
A Correct.
Q Okay. All right. Did you receive any training about pepper spray while at the Texas Department of Criminal Justice?
A Yes, I did.
Q What training did you receive?
A The use, the deployment, the effects, what's in it. Obviously we got sprayed, too, so we have knowledge of exactly how it feels.
Q Okay. And how does it feel?
A It hurts.
Q All right. How many times have you been sprayed, by the way, with pepper spray?
A In my life?
Q Yes.
A I would say over ten times.
Q Okay. How many times did you deploy pepper ball, if any, while at the Texas Department of Criminal Justice?
A Twice.
Q Okay. What were the circumstances of when you

BY MR. WASHINGTON:

Q So I'm talking about the one prior to June 12th.

MS. RIVARD: Same objections.

A I don't recall, but it doesn't -- doesn't seem like -- no, I don't recall. They should have been modified, but I don't know the modification schedule. That's up to the chief and above.

Q Okay. So you talked about damage that occurred following the protest on -- I think you said June 7th. Is that right?

A Uh-huh.

THE OFFICER: Is that a yes or a no?

THE WITNESS: Yes, yes. Excuse me. Sorry.

THE OFFICER: Thank you.

BY MR. WASHINGTON:

Q So please describe for me the damage that occurred -- sorry. Please describe for me the damage that you believe occurred as a result of the June 7th protest.

A There was substantial vehicles that were damaged, and I'm talking about over 28 vehicles. The warden's truck was attempted to be put on fire. They broke windows, glass. They looted cars. They threw big

old river rocks that was from our landscaping to the door, broke the door, broke the window. One went through the window and hit me in the arm.

Q Did you suffer any injuries?

A Besides the -- and a lot of bruising on my forearm, no, that's about it.

Q Okay. And why was it determined, if you know, that a lockdown inside the facility was appropriate to address a protest going on outside the facility?

A Because once you breach doors or windows, that means that you can obviously make your way in. And you know what, the safety and security and accountability of everything that we have is more of a community trust position. So we had to do what we had to do to maintain that order.

Q I guess what I'm saying is, how does that affect the detainees, why they should be locked down?

A Because it's their safety.

Q Safety from --

A Listen. It was to prevent escapes, to -- who knows, maybe -- they could have gone all the way through to the point where, you know what, detainees could have joined in the protest and violence and found a way to escape as well, like it --

Q So are you saying that the concern was that

why we didn't call them at a certain time, whatever.

Q Okay.

A And we actually allotted them even more time on top of that --

Q Okay.

A -- for them to get that completed.

Q All right. And when you say you allowed more time, do you mean that you told them that they would need to lock down a little bit later than you'd previously told them?

A Yes.

Q And when did you tell them that they needed to be locked down by this time?

A I don't remember the time frames.

Q Okay. Did you observe anyone on the 3 side being violent during the second time at the unit?

A No. At this point, we just allotted them even more time than what we had said before, so everybody was happy.

Q Okay. Had anyone made any threats at this time?

A Not at that moment.

Q All right. Then did you advise the chief of security about how your conversations had gone the second time at 2 side and 3 side?

A Yeah.
Q Okay. What did you say?
A Just told him that I gave them like X amount of time, man, so they can make phone calls, do whatever they got to do, we're still good, let's just give them a chance to kind of, you know, do this on their own and we should be good.
Q And who was coming up with the revised times by which they had to be in their cell?
A I'm not sure. It was more like a little team effort here, so -- it was something that we had to get, you know, authorization to do that, but it was Captain Duran and myself.
Q Okay. And how did you get authorization to do that?
A Oh, the chief and -- I don't know if the chief ran it all the way up the chain of command or not, or he just made a decision, but we got the okay from him.
Q Okay. How were you communicating with the chief?
A Phone.
Q Okay.
THE OFFICER: Did you say phone?
MR. WASHINGTON: By phone --
THE OFFICER: Did you say phone?

CERTIFICATE OF DEPOSITION OFFICER

I, ERIN NICKELS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ERIN NICKELS
Notary Public in and for the
State of California

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, JENNIFER FENIMORE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JENNIFER FENIMORE

# Exhibit E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

________________________________

HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on Behalf of Themselves and All Others Similarly Situated,

Plaintiffs,

v.

THE GEO GROUP, INC., a Florida corporation, DOES 1-10,

Defendants.

Case No. 2:22-cv-04014-JGB-SHK

________________________________

VIDEOCONFERENCE DEPOSITION OF

JAMES JANECKA

DATE: Wednesday, July 24, 2024

TIME: 9:04 a.m.

LOCATION: Remote Proceeding
The Geo Group
6167 Bristol Parkway
Culver City, CA 90230

OFFICIATED BY: Erin Nickels

JOB NO.: 6800436

Q I think you mentioned just now, you said that there were several instances which you would characterize as rebellions during your time as warden. What years were those instances?

A I -- I don't think I used the term "several." I said there were times, and I don't remember the exact years.

Q When you said there were some times, were you thinking of anything in particular, any particular instances?

A I had the refusing to be housed or go back in their cells on June 12th.

Q Any other instances?

A Not that I can remember specifically.

Q We mentioned earlier that you had been previously deposed in 2019 concerning a 2017 use of force; is that right?

A Yes. Yes.

Q And was that 2017 use of force -- do you remember the month of 2017 when that use of force occurred?

A No.

Q Do you remember how many detainees were involved in the use of force in 2017?

A Six or seven; I'm not sure.

Q Do you remember the circumstances of that use of force?

A Generally.

Q Were you present for the use of force in that case?

MS. RIVARD: Objection. Vague as to "present."

A No.

Q Was pepper spray deployed within the facility in that case?

MS. RIVARD: Objection. Vague and unintelligible as to "within the facility."

A Yes.

Q And you said you were not present at the use of force. Were you at the facility during that time that the force was used?

MS. RIVARD: Objection.

A Yes.

MS. RIVARD: Sorry. Vague as to "at the facility." Are you asking physically present during the time period?

MS. SWEETSER: Yes.

BY MS. SWEETSER:

Q Were you physically present in the building when the force was used although you were not present to

see the -- let me ask this -- start over. Did you witness the use of force in that case?

A No.

Q Were you in the building at the time the force was used?

A I was in the administrative building.

Q Was there a sergeant or lieutenant who was present at the use of force?

MS. RIVARD: Calls for speculation.

A There was a lieutenant. I don't remember if there was a sergeant.

Q Did that lieutenant contact you prior to using force that day?

MS. RIVARD: Objection. Vague as to time. Vague as to reason for contact. Ambiguous. Unintelligible as phrased.

A No.

Q In 2020, did lieutenants and sergeants regularly carry pepper spray with them in the facility?

MS. RIVARD: Objection. Vague as to the term "regularly." Compound as phrased.

A Lieutenants carried OC. I don't remember if sergeants did.

Q Was there any type of policy throughout your time as warden or facility administrator at Adelanto

threat or are being assaulted. Two individuals hurting themselves. Somebody doing self-harm to themselves with a weapon, and you're trying to prevent them from harming themselves.

And calculated would be if you had an individual, say in a cell, that needed to be moved out and was not harming himself. And you had time to assemble a team, go through the process, try to de-escalate and request -- they would request authorization to use chemical agents if necessary.

Q Was the use of force in 2017 an immediate use of force or a calculated use of force; do you remember?

A I -- I don't remember the details.

Q But you were never contacted before the use of pepper spray in that instance?

A Not that I remember.

Q And you said there were six or seven detainees involved in that incident; is that right?

A That's what I said. Yes.

Q And were they located in the dayroom of a pod when the incident took place?

A In a dorm.

Q And was that on the other side of the facility, the east side?

A Yes.

Q They were in a dayroom of a dorm on the east side?
A Yes.
Q And you remember that the lieutenant deployed OC spray against these detainees; is that right?
A Yes.
Q Do you remember how many GEO employees deployed OC spray in that 2017 incident?
A I don't remember.
Q Do you remember if any pepper ball guns were deployed in that incident?
A I don't remember.
Q Were pepper ball guns routinely carried within the facility?
MS. RIVARD: Objection. Vague as to the term "routinely carried."
A The facility maintained pepper ball guns.
Q Well, you said the lieutenants at that time would carry OC spray with them on a daily basis; is that right?
MS. RIVARD: Objection. Misstates testimony. You asked on a regular basis.
BY MS. SWEETSER:
Q Would lieutenants at that time carry OC spray on a daily basis?

A Lieutenants carry cans of OC spray canisters on their belts.
Q Was there anyone carrying pepper ball guns with them at that time on a daily basis?
A No.
Q I know you don't remember the details of this incident, but do you remember any sort of planning that went to the deploy of the pepper spray or if anyone retrieved a pepper ball gun? Or was this more of an immediate -- lieutenant just sprayed some detainees in the unit?
MS. RIVARD: Objection. Asked and answered. Misstates testimony. Calls for speculation in light of the witness's previous testimony that he doesn't recall the specifics.
A I don't remember the details of that incident.
Q Do you remember if at some point you, personally, went to the dorm where the pepper spray was deployed?
MS. RIVARD: Objection. Vague as to time.
A I don't remember.
Q After the pepper spray was deployed, was that dorm evacuated?
MS. RIVARD: Calls for speculation.

Foundation in light of the witness's previous testimony.

A I don't remember if it was evacuated.

Q And the pepper spray in that instance was used in response to a detainee protest; is that correct?

MS. RIVARD: Objection. Calls for speculation. Foundation in light of the witness's previous testimony.

A What I remember was the detainees were refusing to obey orders.

Q Did anyone ever give you, personally, a copy of the list of demands the detainees had given in that instance?

MS. RIVARD: Assumes facts. Vague as to list of demands.

A I don't remember.

Q Do you remember whether the detainees had present anyone with a list of demands that day?

MS. RIVARD: Calls for speculation. Assumes facts.

A That was seven years ago or so. I don't remember.

Q Were you in charge of reviewing video of the incident after it happened?

MS. RIVARD: Objection. Vague as to "in charge of."

A If I -- I reviewed video. I don't call myself in charge of reviewing it.

Q Was there an after-action review that happened after the incident?

A After-action reviews occur after each use of force incident, and the after-action team consists of ICE, GEO, and medical.

Q Were you part of that after-action review committee?

A No.

Q Did you have any responsibility for reporting that 2017 incident to ICE?

A Yes.

Q Did you have any responsibility for reporting that 2017 incident to the regional office?

A Yes.

MS. RIVARD: Belated objection. Vague as to "regional office." I'm assuming that you're talking about GEO corporate or GEO regional?

MS. SWEETSER: Yes. Thank you.

BY MS. SWEETSER:

Q I meant did you have responsibility to report it to the GEO Group regional office?

A Yes.

Q As part of your reporting duties, did you make

a determination whether the use of force in that case was within policy?

A Not -- the initial is report the incident of what occurred.

MS. RIVARD: I'm sorry. I know you're talking. I can see your mouth moving, but I didn't hear any words. To the witness.

Could anybody else hear or is that me?

MS. SWEETSER: We could hear, but you could repeat yourself. I'm sorry.

MS. RIVARD: I'm so sorry. My hearing must have cut out or speaker.

THE WITNESS: I don't want to misstate what I just said, but I believe I said I reported the incident with the information I had. Pretty much immediate notification.

MS. RIVARD: Thank you. I'm sorry.

BY MS. SWEETSER:

Q At any point did anyone ask you whether you believed what occurred was within policy?

MS. RIVARD: Objection. Potentially calls for attorney-client privileged communications.

I would instruct the witness not to answer as to any conversations that he had with legal counsel or where legal counsel were present. But with

that, you can answer other than that.

THE WITNESS: I don't remember.

BY MS. SWEETSER:

Q Did you form an opinion as to whether it was within policy or not?

MS. RIVARD: Objection. Not reasonably calculated to lead to the discovery of admissible evidence as to another incident in his opinion. Potentially calls for a legal conclusion.

A I -- I don't remember. I don't remember.

Q After the 2017 incident, did you do anything at the facility to respond to the way that the incident had occurred?

MS. RIVARD: Objection. Vague as to "the way the incident had occurred." Unintelligible as phrased.

THE OFFICER: And Counsel, if we could take a break at your next available opportunity.

MS. SWEETSER: Sure. Let me just ask, like, maybe two, three questions --

THE WITNESS: I don't remember.

BY MS. SWEETSER:

Q Was there any kind of policy change at the facility after the 2017 incident in response to that incident?

A I don't remember any.

Q Did you have any meetings after the 2017 incident but before the 2020 incident about what to do in response to peaceful protests within the facility?

MS. RIVARD: Objection. Vague as to time and context. Ambiguous. Unintelligible.

A Not that I can think of.

MS. SWEETSER: Okay. We can take a short break now.

MS. RIVARD: Okay. Thanks.

THE OFFICER: Thank you.

MS. RIVARD: How long? How long?

MS. SWEETSER: Should we take ten minutes?

MS. RIVARD: Thanks.

THE OFFICER: Okay. Thank you. We are now off the record at 10:36 a.m.

(Off the record.)

THE OFFICER: We are now back on the record at 10:51 a.m.

BY MS. SWEETSER:

Q Mr. Janecka, did you review any documents before the deposition today?

A Yes.

Q What documents did you review to prepare for

A Yes.
MS. RIVARD: I'm sorry. Both of you were garble.
THE OFFICER: Could you repeat your question first, Counsel?
BY MS. SWEETSER:
Q At some point, was there a large decrease in the population due to the pandemic?
A Yes.
Q And do you think that the payment rubric changed around that time?
MS. RIVARD: Asked and answered.
A I don't remember when it changed honestly.
Q I know you said that you weren't sure exactly when in the spring of 2020 the protests started, but do you know whether the June 6, 2020, protest we've been discussing was the first protest at the facility or it was not the first one. Do you know?
MS. RIVARD: I'm sorry. Just for everyone's correction. I know everyone's been saying June 6th, but it was actually June 7th according to the records. I don't know if you want to --
MS. SWEETSER: Oh.
BY MS. SWEETSER:
Q Mr. Janecka, do you know whether the protest

was on June 6th or June 7th that we've been discussing?
A There was a protest, yes. I thought the date was the 6th, but it could have been the 7th.
Q Okay.
MS. SWEETSER: Let's, for clarity, just refer to it as June 7th. I'll accept counsel's representation. It may have been on the 6th.
THE WITNESS: I just know it happened. And it was right -- right there. Believe me. I can tell you that.
MS. RIVARD: And I'll say for everyone and also for the Court, it was Sunday, June 7th.
BY MS. SWEETSER:
Q Do you know if the June 7th protest was the first protest that spring or if there had been previous protests at the facility?
MS. RIVARD: Vague as to time.
A I honestly don't remember if there were earlier ones.
Q On June 7th, was the San Bernardino Sheriff's Department present at the facility?
A In the parking lot, yes.
Q Were barricades put up on the 7th?
A No.
Q How many sheriff's deputies were present on

the 7th?

A I'll explain January 7th, if you don't mind.

Q -- June 7th.

A Or June 7th. I'm sorry. On protests typically at the facility, people would start arriving outside of the west building and parking in this -- this vacant lot, pasture, across from -- on the other side of Rancho Road. That -- traditionally, every time a protest would occur, that's where they would stage, and they would have their protest.

And on this event, on the event that occurred June 7th, there was a lot of staff were getting -- that had social media accounts, they were seeing activity. And like I say, this is the time period when a lot of things were going on in the major cities and different places.

And so there was a lot of activity about people flying in from different states. This wasn't like a normal protest where they were coming from the high desert area. These people were flying in from Washington and Oregon and Michigan and coming in from all over. And staff were getting activity, seeing it on social media.

So as law enforcement became involved and said they would support us, what occurred with this large

group, 'cause there was about a total of approximately 400. There was a group that was very disruptive, and there was people -- regular-type protestors built into that group.

They set up down the road of Rancho on the other side of Highway 395. They all staged down there. And they walked from that -- where they staged down Rancho Road. They graffitied up anything they could -- that was on the side of the road. They graffitied the American flags, POW flags. Every stop sign had Antifa marking on it.

They got to past -- there's a fire station that sets close to the road in between the east and west buildings. As they got just past that, there was no perimeter fencing in front of Adelanto at that time, the day of the protest. So you could walk from the road into the parking lot.

What the sheriff's office did that day, not knowing what this group was going to do, several of their resources flanked the crowd walking down the road. Meaning they had vehicles on the sides of them, in front of them, in back of them.

And I don't think -- what was anticipated was is that when the group got close, instead of going across the road, which about half of them did, the other

half took off running straight to the front of the building and caught people off guard. And then it got very, very disruptive from there.

And so it wasn't -- they -- the sheriff set up a little different thinking -- hoping what they were doing was going to be in the best interest. But I don't think anyone expected for about 200 to run straight to the front of the building and then just start immediately busting cars, windows and cutting tires and picking up whatever they could pick up to bust out the front of the windows of the facility.

Q Where were you when the protestors arrived on June 6, 2020?

MS. RIVARD: Seventh.

THE WITNESS: Seventh or sixth?

MS. SWEETSER: Sorry. June 7, 2020.

THE WITNESS: I was in the front. In the main lobby at west.

BY MS. SWEETSER:

Q And you described the protestors walked along the road, and then some crossed over to the lobby. Could you see all of that from where you were in the lobby?

A Yes.

Q Were the lobby doors locked when the

protestors ran across the street?
A Yes. They -- yes.
Q And the sheriff's deputies were all out in the road where the protestors had been?
A Some were on the road, and they had a smaller contingent in the parking lot. But the protestors were able to breach through and get to the front of the building.
Q Do you remember how many were in the parking lot that day, the sheriff's deputies, I mean?
A I -- I just know it wasn't that many. Maybe four to six. It was not a large group.
Q And was there an ICE tactical team present that day, too?
A No.
Q Was your C.E.R.T. team present at the front of the building that day?
A They were in the -- they were in different locations inside of the facilities, in the lobby areas.
Q Did any of the protestors enter into the facility on June 7th?
A They tried. We were able to keep them out.
Q And you mentioned that they had tried to get in the glass doors. Were any able to actually physically come in but then be blocked from entering or

did everyone remain outside the glass doors?

A They were not able to get through. We had a magnetic block there. Staff were also holding the doors. They busted out some of the big windows in the lobby and were trying to climb through those windows. And staff would have the -- C.E.R.T. team was having to use force to keep them out of the building.

Q Okay. And then I'd just like to ask you some questions about the C.E.R.T. team now. Is there one C.E.R.T. team for the Adelanto Detention facility?

A Yes.

Q Who is the commander of the C.E.R.T. team?

MS. RIVARD: Vague as to time.

A I don't know who the commander is at the moment. The commander in 2020 was Jordan Bunn.

Q How many people were on the C.E.R.T. team?

MS. RIVARD: Vague as to time.

MS. SWEETSER: In 2020.

THE WITNESS: In 2020, I would say approximately 24 to 25.

BY MS. SWEETSER:

Q Did the people on the C.E.R.T. team, the members of the C.E.R.T. team, have other duties when the C.E.R.T. team was not in use?

A Yes. They were detention officers.

A No.
Q Apart from the incident we're talking about, June 12, 2020, had you ever ordered the use of pepper spray at the Adelanto facility?
A Yes.
Q How many occasions?
A I don't remember.
Q Were these occasions where people had come to you for authorization of the use of pepper spray?
A Can you repeat that?
Q Were these -- let me preface. You don't remember how many occasions. Were there more than ten occasions on which you ordered the use of pepper spray?
MS. RIVARD: Is that before June of 2020?
MS. SWEETSER: Before June of 2020.
THE WITNESS: Up to June 2020?
MS. SWEETSER: Yes, up to.
THE WITNESS: I don't remember.
BY MS. SWEETSER:
Q During your whole time at Adelanto, do you know if it was more than ten occasions on which you ordered pepper spray?
A I don't know.
Q Do you remember any of the circumstances of any other occasions in which you ordered the use of

pepper spray?
A A couple of them were cell moves, detainees committing self-harm, and we had to get to them before they harmed themselves. A couple would be in segregation, and we needed to move them to a different location, and they would refuse. And in order to protect staff and the detainee from physical injury, I would authorize it if necessary.
Q So it sounds like there were at least four other occasions where you authorized the use of pepper spray; is that right?
A I don't know how many.
Q Okay. Well, you mentioned there were a couple in segregation, a couple related to self-harm. So would you say there's probably more than four occasions on which you ordered the use of pepper spray?
A Probably more, yes.
Q And GEO Group never trained you on the use of pepper spray?
A Excuse me?
Q GEO Group never trained you on the use of pepper spray?
MS. RIVARD: I'm sorry. I couldn't understand the first three words.
//

Q What time did you have your conversation with Mr. Valdez?
A The initial conversation was 5:30.
Q So it was an hour before -- he asked you to put them into their cells in the next hour?
A It was an hour that was spent trying to use verbal persuasion to get them to go into their cells.
Q Okay. So I'm just trying to get this timeline clear. So at 5:30, you spoke with Mr. Valdez. And he said to get them into their cells by any means using all necessary force; is that correct?
A The force necessary to get them in their cells.
Q And that was at 5:30?
A Approximately, yes.
Q And you said you had a conversation with Chief Reveteriano at some point; is that right?
A I couldn't recall or remember who I spoke to, if it was Reveteriano or AFA Johnson.
Q So either Chief Reveteriano or AFA Johnson, you relayed the request to put them into their cells; correct?
A I relayed the order that Mr. Valdez had given.
Q And you said that you were authorizing the use of all force necessary to put them in the cells;

correct?
A I said, "He authorized use whatever force is necessary to put them in their cells."
Q Okay. But you were the person who was the final decision maker on GEO to use pepper spray in the facility; correct?
MS. RIVARD: Misstates testimony.
A I think my earlier statement was, if I recall, I followed the order of my client, Mr. Gabriel Valdez. And he said to use whatever force is necessary to put the detainees in their cells.
Q Does Mr. Valdez --
A I relayed that order to one of my administrative staff to relay to the C.E.R.T. team.
Q Was Mr. Valdez a final decision maker for GEO Group?
A If it has any decisions to be made with his detainees, he would have ultimate say.
Q And that's reflected in the contract, to your understanding?
A Yes.
Q Do you know what section of the contract that's reflected in?
A No.
Q Do you know what level of orders he's allowed

mission, I'll defer to him. He knows what he feels is best and safest for his staff that he's going in with.

Q Was it your understanding that pepper ball guns and pepper spray would be deployed in the three housing units?

A I became aware of it after the fact.

Q When you told Chief Reveteriano or AFA Johnson, whichever person you gave the authorization to -- when you told them to use all force necessary, was it your understanding that they would deploy the munitions used by the C.E.R.T. team?

A If it was necessary.

Q And that was authorized by you; correct?

A After communicating with Mr. Valdez, yes.

Q Did you instruct the staff members to look at the medical records of any detainees prior to the use of force in the unit?

MS. RIVARD: Objection.

A There wasn't enough time.

THE OFFICER: I'm sorry. Can you repeat the objection?

MS. RIVARD: Objection.

THE OFFICER: And what did you state, Mr. Janecka?

THE WITNESS: I said there wasn't enough

CERTIFICATE OF DEPOSITION OFFICER

I, ERIN NICKELS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



ERIN NICKELS

Notary Public in and for the

State of California

Date: August 7, 2024

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, SARAH MARTINES, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



SARAH MARTINES

Date: August 7, 2024

# Exhibit F

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

________________________________

HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v. Case No. 2:22-cv-04014-JGB-SHK

The GEO Group, Inc., a Florida corporation, DOES 1-10,

Defendants.

________________________________

VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE FOR THE GEO GROUP, INC. - JOSHUA JOHNSON

DATE: Tuesday, August 6, 2024

TIME: 9:13 a.m.

LOCATION: Remote Proceeding
Adelanto, CA

OFFICIATED BY: Fernando Padilla

JOB NO.: 6800419

to the detainees they know have been sprayed, should they tell the detainee about the eyewash facility?

A Typically, we don't use the eyewash for "decon" because the water pressure's kind of high and that's not the best thing. We offer cold water shower for "decon."

Q When were the showers in the intake changed to cold water?

MS. RIVARD: Objection, assumes facts as to the change.

But go on.

THE WITNESS: I believe around 2018.

BY MS. SWEETSER:

Q Why were they changed to cold water showers?

A I think we had an event where we did "deconing," and the facility, due to the PBNDS standard not letting us have hot and cold water -- at that time, we only had the regular showers available with just the one button, so we couldn't set the temperature on them. So when we went to "decon," it would -- it would tend to make it feel less comfortable on the "deconing."

Q And by "less comfortable," you mean it would be more painful to shower in the hot water?

A It would not activate it, but yeah, cold water feels better than warm water.

Q Was that event that you're referring to a protest that took place in the facility in 2017?

MS. RIVARD: Objection, vague and ambiguous as to the term "protest."

A Yeah, I think it was at the east facility. I -- I don't remember if they were protesting or not, but yeah.

Q Do you remember if the detainees had presented officers with a list of demands in that instance?

MS. RIVARD: Objection, calls for speculation, foundation, assumes facts.

A I -- I don't remember.

Q Were you chief of security at Adelanto at the time of that event?

A Yes.

Q And pepper spray was deployed in that incident?

A Yes.

Q Do you remember how the area where pepper spray was deployed was "decon'd" in that incident?

A I don't remember. That's a different building.

Q Do you remember if, after that incident, the detainees that were in that area were evacuated out to the rec yard?

MS. RIVARD: Objection, foundation, speculation, assumes facts.
A Yes, they were, I believe.
Q Where feasible, should detainees be evacuated from the area while it's "decon'd" after pepper spray is deployed?
A Say that again.
Q We're feasible, should detainees be evacuated from the area while it is being decontaminated after pepper spray is deployed?
A Yes.
Q Is it important to decontaminate the detainees as soon as possible after their exposure to chemical agents?
A Yes.
Q And why is that?
A Just to get the -- the comfort level back down. OC is not good to have on you.
Q Where is the intake located in the facility?
A At what facility?
Q At west.
A At west? It's towards the front of the building on the -- the east side.
Q How many showers are available at the intake?
A There is a total of six showers. Only one is

A Yes, that one particular call that I saw.
Q On the call that you saw, did the detainee's wife tell her husband that they should riot?
A She said, "You guys should riot just like us," because they were rioting out in front of our building, breaking windows.
Q And in your recollection, there wasn't any response from the detainee?
A I don't remember what he said to her.
Q Okay. So besides the detainee communicating with his wife, were there any other communications from people outside the facility on the day of this protest?
A I'm only aware of that one. I also remember the protesters trying to break into the armory.
Q What time did you become aware of the video?
A The -- the civil protests had been going on for a minute because they had already broken the window, so it was probably halfway through that protest. I'm not sure how long that lasted. That was a long time ago.
Q Did anyone send any emails regarding that video?
MS. RIVARD: Objection, vague as to "anyone." Are you talking about people outside?
MS. SWEETSER: No, I'm talking about GEO

CERTIFICATE OF DEPOSITION OFFICER

I, FERNANDO PADILLA, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

FERNANDO PADILLA
Notary Public in and for the
State of California

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, JENNIFER ZAVATTARO, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JENNIFER ZAVATTARO

# Exhibit G

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

________________________________

HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v. Case No. 2:22-cv-04014-JGB-SHK

THE GEO GROUP, INC., a Florida corporation, DOES 1-10,

Defendants.

________________________________

VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE FOR THE GEO GROUP, INC. - JOSHUA JOHNSON

VOLUME II

DATE: Thursday, August 8, 2024

TIME: 9:22 a.m.

LOCATION: Remote Proceeding
Adelanto, CA

OFFICIATED BY: Fernando Padilla

JOB NO.: 6856853

the record at 11:32 a.m.
BY MS. SWEETSER:
Q Okay. Great. So Mr. Johnson, you understand that you're still under oath?
A Yes, ma'am.
Q Great. All right. I'm going to ask you some questions now about June 12, 2020. What was the first time that you arrived at the facility that day?
A I don't remember the exact time, but it was in the earlier morning, probably eight, nine o'clock a.m.
Q Did you have a regular shift that you worked at that time?
A Typically my workday starts about 6:30 and will run till about 4:00 to 4:30.
Q Was there a reason you were working at a later time on June 12th as opposed to your usual schedule?
A We had Intel that we had a potential protest, so we knew it was probably going to be a later night.
Q When did you learn that there was a potential protest scheduled for June 12th?
A A few days prior.
Q Did you have any meetings about that protest? The potential protest?
A I don't remember. I -- I remember we had one tactical meeting because we had multiple agencies

involved with this protest for the facility's safety.

Q Do you remember when that tactical meeting was?

A No, that was like four years ago.

Q Was it prior to June 12th?

A Yes.

Q Was it more than two days before June 12th?

MS. RIVARD: Speculation in light of the witness's previous answer.

You can answer.

THE WITNESS: I don't remember.

BY MS. SWEETSER:

Q At that meeting did anyone discuss whether the detainees should be locked down in their cells during the protest?

A I don't recall.

Q At some point were you made aware that the facility administrator had made a decision to have a lockdown of the facility?

MS. RIVARD: Objection. Speculation. Foundation.

A The prior week on the 7th I believe we had a major event outside the facility, and it required a lockdown halfway through the event of the population for their safety. So I do believe we had a plan to do a

modified type program for the population on the 12th.
Q And when you say it was a plan to do a modified program, did that mean locking the detainees inside their cells?
A It means securing the facility and shutting off the phones and securing the detainees inside their cells.
Q Do you remember who told you that there would be a modified program that day?
A I believe it was part of the command plan. We had the facility administrator, the executive team, and I believe we had the regional person for operations.
Q Who was the regional person for operations at that time?
A It was Mr. Moorhead.
Q Did you see Mr. Moorhead at the facility on June 12th?
A Yes.
Q Was he there when you arrived around 8:00 or 9:00 a.m.?
A Yeah. Yeah, he was there that day.
Q When you say it was part of the command plan, was there a written plan that you're referring to?
A I don't remember that. I remember we had a map where we were staging different resources out of.

units were on June 7th?

MS. RIVARD: Assumes facts. Calls for speculation. Foundation.

If he knows.

THE WITNESS: I don't remember.

BY MS. SWEETSER:

Q So you don't remember noting anything that was going on in the housing units that day?

MS. RIVARD: Object. Vague as to "noting."

A It was four years ago. I don't -- I don't remember. And my attention was at the front of the building, not the back.

Q On June 7th, were you at the front of the building that day?

A Yes, ma'am.

Q Did you stay there most of the day dealing with the outside protestors on June 7th?

A A good portion of the day was spent in the front of the building. Yes, ma'am.

Q Sorry. So on June 12th when you arrived in the early morning at 8:00 or 9:00 a.m., was the modified program already in place?

A No, I think we were waiting for the 10:30 count.

Q And when you say you're waiting for the 10:30 count, did you intend to have the detainees go to their cells for the 10:30 count?
A Detainees always go to their cells for count.
Q Was the intention to lock them down during the 10:30 count?
A After we conducted our account, we were going to secure the facility, yes.
Q Okay. And just as a -- on a very simple level, when you say after you conducted the count, you're going to secure the facility -- as you counted the detainees, would that involve closing the doors to each cell as you counted them?
A After you counted them? Yes, it would involve securing the door.
Q Between when you arrived at the facility and 10:30, what were you doing?
A I was -- I met with the facility administrator and then I was doing rounds around the facility to make sure our staff were strategically placed in the appropriate location.
Q And when you say you were strategically placing staff in appropriate locations, was that with regard to the front of the building and the outside of the building, or was it with regard to the housing

units?

A It was everything within the or outside of the facility. Nothing was inside.

Q Did you visit the housing units between when you arrived at the facility and 10:30 a.m.?

A No.

Q And when the 10:30 a.m. count began, where were you yourself?

A I was out front.

Q At some point during -- around 10:30, were you informed that some detainees were not going to their cells?

A I don't remember the exact time, but yes, I was notified of detainees refusing to rack up for count.

Q And who notified you of that?

A It -- it was one of the captains; I don't remember which one.

Q Where were you located when that person notified you?

A I was in the front lobby, the front of the building.

Q At that time, do you remember if there were any outside protesters present near the facility?

A There were no protestors at that point. Yeah.

Q When were you expecting -- well, if you

A No.
Q Does the CERT team -- strike that.
Have you seen -- is there any other occasion where you had seen the CERT team carrying pepper ball guns in the facility?
A They use them for training.
Q Other than a training scenario, had the CERT team ever brought pepper ball guns into the facility in your experience?
MS. RIVARD: Objection. Vague as "into the facility." I think the armory in the facility.
BY MS. SWEETSER:
Q Well, into the housing units. In your experience.
A I believe one other time we had a unit where we deployed them but we didn't use them.
Q Do you remember what the reason was for deploying the pepper ball guns?
A It was a similar incident. I don't think it was over count, but it was a unit refusing to rack up -- an entire unit -- just one unit.
Q Do you remember around what time that -- what day that was? Like, in 2020 or another year?
A No, it was prior to this event, and I -- I don't recollect the year.

Q And no pepper balls were fired in that case?
A No.
Q After you gave this final order, did you go back into the housing units again?
A I went behind the CERT team. I believe that was the next time I went into those unit or I didn't even go into all the units. I think I was -- just went into two.
Q Do you remember which two units you went into?
A That I went into Bravo and Charlie. I could be wrong; it was long time ago.
Q Do you remember which one you went into first?
A No.
Q When you entered the unit with the CERT team, do you remember hearing someone give the CERT team the order to saturate?
A It's loud in there. I -- I don't know.
Q Do you remember who was giving the orders to the CERT team in the unit that you were in?
A I -- I would assume it was Sergeant Bunn, but I'm not sure.
Q Did Sergeant Bunn -- well, did anyone give an order to split the CERT team into different groups to go into each unit? Or did the CERT team, the entire CERT team, go into each unit sequentially?

Q Did you talk to any Geo personnel about whether they should contact medical before going into the units?
A I don't remember.
Q And so just going back to the immediate or calculated use of force -- you said you didn't -- it wasn't a calculated use of force because you didn't believe force would be used. Is that right?
A Didn't know if force was going to be used.
Q As far as you were aware, was there authorization to use pepper spray and/or pepper balls in these units?
A When force was authorized, those are tools in the toolbox. I leave it to the discretion of the commander to use whatever tool works best.
Q Was there any understanding or planning as to when force would be deployed?
A I don't remember. We pretty much -- once the OIC and the FA directed us to get them racked up, force was authorized; only had about 20 minutes.
Q Wait, I'm sorry, could you clarify that. You only had 20 minutes from when to when?
A Once force was authorized and the OIC insisted that the detainees be racked up and counted, it wasn't a very long period of time.

Q What was the deadline that you were trying to meet?

A The 6:30 count to do a correct face-to-photo count.

Q Was there a reason that 6:30 -- what was the urgency that the detainees needed to be counted at 6:30? And what was the urgency there?

MS. RIVARD: Calls for speculation. Foundation.

A We had a protest outside and from the prior week we knew detainees were communicating with them. We needed to get an accurate face-to-photo account to ensure that -- you know, all the detainees were safe. Nobody was stabbed in a closet or it was -- this was being used as a distraction.

So I needed to get them in their cells counted correctly and secured. So I could say with definitive that I have everybody that I'm supposed to have and they're safe.

Q How many officers were usually in each unit?

A One.

Q Before the lockdown began on June 12th, was there still one officer in each unit?

MS. RIVARD: Objection. Vague as to time as to when the lockdown happened.

disturbance.

Q When you say when it went through the motions, what do you mean?

A Like, when we had to go in and every unit refused to comply and we had to use immediate force.

Q So prior to the use of force, would you have classified it as a disturbance?

A I classified it as a rule violation 198.

Q Would you also classify it as a disturbance?

A There was no force yet, so it wouldn't have been a disturbance yet as a rule violation.

Q Did this incident only become a disturbance after the officers used force?

A After they failed to comply to the orders to rack up.

Q Okay. But that's a different time period. Right? So I'm just trying to see when you feel that it became a disturbance. So around 10:30 the detainees told you they were refusing to go into their cells. Correct?

A Yes.

MS. RIVARD: Objection. Objection. Counsel is testifying and misstating testimony. Motion to strike all portions of that question prior to the very last part discussing 10:30.

have a potential with accountability for detainees and staff because we weren't able to do an accurate count at that time.

BY MS. SWEETSER:

Q In your opinion, was there an increase in urgency between, say, 3:00 p.m. and 6:30 p.m. to get the detainees in their cells?

MS. RIVARD: Objection. Vague as to the term "urgency." And calls for speculation.

Are you talking about with him personally or somebody else?

BY MS. SWEETSER:

Q In your opinion, you personally, was there an increase in urgency in the need for the facility to get the detainees into their cells between 3:00 p.m. and 6:30 p.m.?

A Yes, there was because on June 7th, as you know, we had the -- the very violent protest here with, you know, 400-something people.

You know, the -- the -- the political climate out there with the George Floyd, with the Portland, Oregon, you know, with all the anti-government sentiment -- knowing I'm having a protest at four o'clock just coming, you know, five, six days from one that was very violent, destroyed a lot of vehicles,

including Sheriff's vehicles, overwhelming our resources -- I thought it was very important to have those detainees secured because that would've just been one less thing to worry about. They would've been safe, they would've been accounted for, and then I can take my resources and concentrate on the outside threat.

Q So in your opinion was that urgency created by the 4:00 p.m. timeline that you had been informed of?

A It definitely started upticking as protestors arrived and they -- if I remember right, it was right around the four o'clock period they started arriving.

Q In your opinion, would the use of force against detainees refusing to rack up have been justified at 4:00 p.m.?

A Per policy for refusing a count and, you know, the way they were posturing, it could have gone, you know, for the 10:30 count. I think my staff exercised a lot of patience , worked really diligently with the population, and was very reasonable.

Q So in your opinion could the facility have started preparing for use of force at 10:30?

MS. RIVARD: Improper hypothetical. Calls for speculation.

A No, we wouldn't have prepared for use of force at 10:30 because the -- didn't have a threat to the

CERTIFICATE OF DEPOSITION OFFICER

I, FERNANDO PADILLA, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

FERNANDO PADILLA
Notary Public in and for the
State of California

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, RACHEL LUNAN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

RACHEL LUNAN

# Exhibit H

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

April 25, 2018

MEMORANDUM TO: Matthew Albence
Executive Associate Director
Enforcement and Removal Operation
U.S. Immigration and Customs Enforcement

FROM: Veronica Venture (b) (6) [redacted]
Deputy Officer
Office for Civil Ri[redacted]

Dana Salvano-Dunn (b) (6) [redacted]
Director, Compliance
Office for Civil Rights and Civil Liberties

SUBJECT: Adelanto Correctional Facility Complaint Nos. (b) (6) [redacted]

The U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL) is conducting an investigation into conditions of detention for U.S. Immigration and Customs Enforcement (ICE) detainees at the Adelanto Correctional Facility (ACF) in Adelanto, California. CRCL's onsite investigation, which occurred on November 13-14, 2017, was a follow-up review to our December 2015, onsite investigation. In addition, the onsite investigation was in response to three detainee deaths and CRCL's receipt of more recent allegations at ACF in the following areas: medical care, mental health care, use of force, hunger strikes, segregation, grievances, staff-detainee communication, legal access, language access, and suicide prevention and intervention.

We greatly appreciate the cooperation and assistance provided by ICE and ACF management and personnel before and during the onsite. As part of the review, CRCL used the same independent subject-matter experts that we used for the 2015 onsite: a medical consultant, a mental health consultant and a penologist. As a result of detainee and staff interviews, document reviews, and direct onsite observations, our experts identified concerns related to medical and mental health care, use of force, segregation and housing, grievances, staff-detainee communication, legal access, language access, and suicide prevention and intervention. At the

[1] Complaint No. (b) (6) [redacted], alleging inadequate conditions of detention and lack of appropriate visitation, was added to the Adelanto complaints after CRCL disseminated the Retention Memo to ICE.

conclusion of our onsite investigation, CRCL and the subject-matter experts held an exit-briefing where we relayed our findings to local ICE and ACF management and relevant field personnel. During those discussions, the subject-matter experts also provided recommendations to address many of the identified concerns.

Due to the serious nature of certain health and safety-related findings, CRCL also submitted initial informal recommendations to ICE leadership on November 20, 2017 for immediate action. We understand ICE has been working on addressing those matters over that last few months, including a site visit during the week of March 12, 2018.

Enclosed with this memorandum are the reports prepared by our subject-matter experts. The experts' priority recommendations are listed below in the body of this memorandum. CRCL requests that ICE formally concur or non-concur with these recommendations and provide an implementation plan for all accepted recommendations within 60 days.

**Recommendations**

***Medical Care***

CRCL's medical expert made the following priority recommendations regarding medical care at ACF. All of these recommendations relate to the 2011 PBNDS Medical Care Standard, which requires timely and efficient access to medical services

**Medical Leadership**

1. (b) (5) [redacted]
2. (b) (5) [redacted]

**Provider Staffing**

The ACF medical contractor, Core Civic Solutions (CCS), in consultation with IHSC, should increase day-to-day medical care for detainees at ACF. Attention should be focused on the following areas of concern:

3. Current staffing levels and appointment scheduling are inadequate and lead to a high rate of appointment cancellations and chronically delayed access to care. **The current inadequate provider staffing levels and appointment scheduling problems should be corrected in the following ways**. (PBNDS 2011 Medical Care: II.1, II.5 through 9, II.21 and 22, II.27, V.A and B, V.F.3.a, V.U and W, V.BB)

    a. Providers should not be allowed to fully control and change their own appointment schedules.

    b. Detainee appointment cancellations at ACF should be monitored and tracked.

    c. When detainee-patient cancellations *are* appropriate, the detainee should be rescheduled for the first available provider.

4. Those providers whose medical care has been sub-standard should be more closely monitored and supervised. Probation or temporary limitations of privileges should be considered for those problematic providers, in order to ensure improvements. (2011 PBNDS Medical Care: II.21, V.B, V.T and U)

**Detainee Returns from Offsite Care**

The current inadequate "hand-off" procedures being utilized, when detainees return from medical or mental health care at an outside hospital, emergency room or medical specialty consultation should be improved to ensure an appropriate continuum of care. (2011 PBNDS Medical Care: II.1, II.7 and 8, II.12, II.16 and 20, V. A and B, V.F.a, V.G.2 and 12, V.I, V.S.4 and 5, V.W) Attention should be focused in the following areas:

5. (b) (5) [redacted]

6. (b) (5) [redacted].

7. (b) (5) [redacted]

8. **In all cases where the ACF provider choses to deviate from the care recommended by the outside specialist, a full and complete note should immediately be entered in the medical record** documenting the clinical rational for deviating from the recommended care.

**Custody Staffing Support for Medical**
ACF custody staffing and transportation is currently inadequate to support medical operations and ensure uninterrupted access to appropriate and needed medical care. (2011 PBNDS Medical Care: II.7, V.A and B, V.R and S, V.W)

9. **Custody staffing and transportation capacity should be increased** to adequately support the medical operation and ensure uninterrupted access to appropriate and needed medical care.

10. **Medical appointments – either within the facility or outside (such as a consultation with an off-site specialist) – should not, absent extraordinary circumstances, be canceled due to unavailability of medical duty officers or "runners," or for lack of transportation vehicles** (including transport by wheel chairs or gurneys).

***Mental Health Care***

CRCL's mental health expert made the following priority recommendations regarding medical care at ACF. All of these recommendations relate to the 2011 PBNDS Medical Care Standard, which requires appropriate, timely, and efficient access to mental health services.

11. Following CRCL's 2015 investigation, it was reported to ERO and GEO management that psychiatric leadership was absent at ACF and that sub-standard mental health care was occurring as a result. During the 2017 onsite, there was no evidence that corrections had been implemented to address this concern. This failure to hire an effective, qualified psychiatric leader continues to pose a risk to the safety of other detainees at ACF. Accordingly, **ACF should hire competent, qualified and effective on-site psychiatric leadership, immediately.** (2011 PBNDS Medical Care: II.5, II. 8 and 9, II.12, II.14 through 16, II.20 and 21, II.25 and 27, II.30; V.A.1-7, V.B, V.F.1 through 3.a, V.G.1 through 4, V.G.6, V.G.11 and 12, V.I-J.2 and 4, V.J.12 and 13, V.J.16 through 19, V.M.1 and 2, V.N.1 through 6, V.Q, V.R.1.a and f, V.R.2, V.S.4 and 5, V.U, V.W, V.X.6 through 12, V.Y.1.b and .4.c.a), V.BB.2.e, V.DD)

12. (b) (5) [redacted]

13. The ACF medical contractor, in consultation with ICE IHSC and a skilled psychiatrist leader, should review all cases of ACF detainees with serious mental disorders to ensure accuracy or make appropriate changes. Attention should be focused on the following serious areas:

a. **Collateral data should be obtained for each ACF detainee with a serious mental disorder. Moving forward, this data should be acquired and entered in each detainee's initial mental health evaluation and reviewed by the admitting clinician.** In cases where collateral data was never obtained, clinicians should obtain it and document it in the chart. During the investigation, collateral data was absent in ***all*** cases reviewed. Typically, this data comes from the facility where the detainee was housed prior to their transfer to ACF, or from family members. If records cannot be obtained, ACF clinical staff should develop communicative relationships with staff at the facilities where ACF detainees most commonly come from and obtain this information by phone, which is permitted and expected under HIPPA, for purposes of patient safety and coordination of care. (2011 PBNDS Medical Care: II.1 and 5, II.15 and 23, II.30, V.J and K, V.M and N, V.S.5, V.U and W, V.Y, V.BB)

b. **IHSC and CCS and should review diagnoses and medication to ensure they are correct and appropriate. Attention should be given to taking detainees off ineffective medications** – such as those only absorbed well with a meal, but are not administered at ACF meal times, or antipsychotics prescribed as PRN's (as-needed medications) for detainees with clear histories of taking long-acting antipsychotic injections. If detainee-patients refuse medications or injections, the ACF mental health providers should work with the detainee so the detainee will accept them, and then document those compliance attempts. **(**2011 PBNDS Medical Care: II.1 and 16, II.20 and 27, II.30, V.G and H, V.J.2 and 4, V.J.11 through 13, V.J. 16 and 17 narrative, V.M, V.N.1 through 3, V.N.4 through 6, V.Q, V.R and S, V.W and Y, V.BB)

c. **There should be a housing review and assessment for each detainee with a serious mental disorder to determine whether their housing is appropriate, given the detainee's clinical status.** Although clinical staff reported that some stabilized detainees are segregated because they have *requested* to be in segregation, each detainee should be at the least restrictive level of care when at all possible and deemed appropriate by mental health leadership, taking into account the detainee's mental health status and progress. **(**2011 PBNDS Medical Care: II.5 and 6, II.13, II.27 and 30, V.F.3, V.N, V.Q and S, V.Y, V.BB)

d. Detainees with serious mental disorders are routinely – and inappropriately – housed in administrative segregation at ACF. **Detainees with serious mental disorders should only be housed in administrative segregation as a last resort,** as that environment is not conducive to improving mental health status. **(**2011 PBNDS Medical Care: II.5 and 6, II.13, II.27 and 30, V.F.3, V.N, V.Q and S, V.Y, V.BB; ICE Directive 11065.1, Review of the Use of Segregation for ICE Detainees [Segregation Directive] from the PBNDS 2011 revisions to 2.12 Special Management Units)

14. **In all cases where the ACF provider chooses to deviate from the mental health care recommended by an outside specialist (including a recommendation to continue a long-acting antipsychotic injection), a full and complete note should be entered in the detainee's medical record documenting the clinical rational for the deviation** from the outside provider's recommended care. (See recommendation 8 under Medical Care for further clarity.) (2011 PBNDS Medical Care: II.1, II.7 and 8, II.12, II.16 and 20, V. A and B, V.F.a, V.G.2 and 12, V.I, V.S.4 and 5, V.W)

15. **Custody staffing and transportation capacity should be increased to adequately support the mental health operation. No clinical mental health appointment – either within the facility or outside – should be canceled due to officer unavailability. Staffing and transportation should be increased to ensure uninterrupted access to appropriate medical/mental healthcare.** In 2015, it was recommended that the facility create an office on the West (men's) side for mental health staff to be able to see male detainees without reliance on officers to escort them to clinic, but this important recommendation was not implemented and resulted in related problems that were found during the 2017 onsite. It remains a necessary recommendation. (2011 PBNDS Medical Care: II.7, V.A and B, V.R and S, V.W)

16. **ACF's medical contractor, in consultation with ICE IHSC, should immediately institute an electronic Medication Administration Record (MAR).** Currently, there is no electronic capability allowing ACF mental health staff to see what medications any detainee-patient is currently taking. Although the current ECW has the capacity for this, security concerns were cited as a reason not to provide wireless accessibility throughout the facility. This prevents nurses from documenting on laptops when detainees take their medications or refuse them (which is the standard process in most correctional settings). The ability to do this is especially critical for psychiatric patients, who decompensate quickly when not taking their prescribed medications; often resulting in poor outcomes. ACF's lack of one master electronic MAR has resulted in there being three different records of current medications (ECW current meds, the paper MAR, and the progress notes) which were found to be often contradictory. When clinical staff are forced to go to great time-consuming lengths to pull up a paper MAR and compare the data for medication errors or poor patient adherence, the detainee's safety is at risk. (2011 PBNDS Medical Care: II.23 and 27, V.S, V.Y.1.a)

17. **ACF's medical contractor, in consultation with ICE IHSC, should immediately populate the electronic medical record (ECW) with the detainee-patients' location.** When ACF's clinical staff do not know where their detainee-patients are located, those detainees may not be seen as needed and required. In addition, staff may mistakenly assume the detainee is in an offsite hospital when they, in fact, have just returned to ACF, which is a vulnerable time for those detainees. The detainee's clinical team should know where their detainee-patient is located. It is technically possible, and should be made a priority for GEO to connect with ECW to populate this data, which will better

ensure patient safety. (2011 PBNDS Medical Care: II.8 and 12, II.20 and 23, V.F.3.a.3 and 4, V.G.12, Y.1.a and b)

***Conditions***

CRCL's corrections expert made the following priority recommendations. All of these recommendations relate to the 2011 PBNDS.

18. In 2015, CRCL recommended that ACF use interpreters and/or language lines consistently for LEP detainees during the intake screening process and completion of the important and required intake forms. ACF continues to fail to meet the Admission and Release Standard. Interpreters or language lines are not being consistently used for LEP detainees during the intake screening process and completion of the intake forms. **ACF should consistently use interpreters or language lines for LEP detainees during the intake process.** (PBNDS 2011 Admission and Release: II.8, V.F, V.G)
19. (b) (5) [redacted]
20. (b) (5) [redacted]
21. In 2015, CRCL recommended that the Mental Health Director and IHSC ensure that ACF Mental Health staff conduct daily face-to-face rounds with all detainees in the SMU, and provide appropriate mental health assessments and treatment. Daily rounds are being conducted; however, **one of the rooms in the SMU should be converted into an interview room where private face-to-face interviews between mental health personnel and detainees can be effectively conducted.** (PBNDS 2011 Special Management Units: II.6 and 7, II.8, V.A, V.F; Medical Care: V.F.1, V.N)
22. (b) (5) [redacted]

(b) (5) [redacted]

23. (b) (5) [redacted]

24. In 2015, CRCL recommended that ERO and ACF Management (including the Warden) develop a reporting system to ensure that facility personnel effectively respond to and resolve the detainee grievance issues assigned to them by the Grievance Coordinator and then report back to the Grievance Coordinator that the matter is resolved. This was not corrected. CRCL again recommends that **ICE and ACF should develop a reporting system to ensure that facility personnel respond and resolve detainee grievances.** (PBNDS 2011 Grievance System: II.2 and 3, II.6 and 8, V.A, V.B.7, V.C)

25. In 2015, CRCL recommended that ERO and ACF Management develop a tracking system to enable review and trend analysis of all grievances involving staff mistreatment. This was not corrected. **CRCL again recommends that ICE and ACF should develop a grievance tracking tool.** (PBNDS 2011 Grievance System: V.D and F, V.H)

26. In 2015, CRCL recommended that ICE should receive a copy of staff mistreatment grievances upon receipt by the GEO Grievance Coordinator. This was not corrected. CRCL again recommends that **detainee grievances involving staff misconduct should be submitted to ICE as mandated by the PBNDS.** (PBNDS 2011 Grievance System: V.F, V.G).

27. In 2015, CRCL recommended that ACF should hold facility staff accountable for substantiated abusive and disrespectful treatment of detainees, as determined by the Grievance Coordinator and/or other facility personnel. This was not corrected. CRCL again recommends that **ACF should hold facility staff accountable for substantiated abusive and disrespectful treatment of detainees.** (PBNDS 2011 Grievance System: V.G)

28. In 2015, CRCL recommended that ERO and ACF develop a post-assignment schedule that creates a sufficient staffing plan that resolves the current, problematic staffing deficiencies. The deficiencies are negatively affecting operational needs, including excessive count times and meal delays, and limitations in access to visitation, law library, and recreation. The post assignment schedule has been revised and additional correctional officer positions have been added, however this has not resolved the problem. **The correctional officer medical escort and transportation staffing should be increased to**

**adequately support the medical and mental health escort needs** within the facility and to outside appointments. (PBNDS 2011 Post Orders: V; Food Service: II.4, V.D; Visitation: II.4 and 6, V.B and J; Recreation: II.4, V.B; Law Library and Legal Material: II.2, II.4 and 5, V.C)

29. (b) (5) [redacted]

30. (b) (5) [redacted]

31. (b) (5) [redacted]

32. **ERO and ACF should ensure that all forms issued to detainees for informational purposes, but especially those requiring detainee signatures, are written and/or translated in a language the detainee comprehends, or provide oral interpretation of these forms and document the provision.** All written material provided to detainees shall generally be translated into Spanish. (DHS Language Access Plan, 2012) (2011 PBNDS: Multiple)

33. (b) (5) [redacted]

34. **A separate healthcare medical grievance log should be instituted to track healthcare-related grievance submissions and ensure timely responses**. (PBNDS 2011 Grievance System: II.10, V.A, V.C.2 and 4)

35. **A monthly audit should be conducted of submitted healthcare grievances to improve timeliness of care** and ensure appropriate access to medical, mental health and dental care. (PBNDS 2011 Grievance System: V.C.4)

36. **ACF must provide access to a cold-water shower in the East and West wings for decontamination of detainees who have been exposed to OC Pepper Spray**. (PBNDS 2011 Medical Care: V.F; Use of Force and Restraints: V.A.5, V.B.6 and 11, V.B.14, V.D.2)

It is CRCL's statutory role to advise department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. We look forward to working with ICE to determine the best way to resolve these complaints. You can send your response and action plan by email. If you

have any questions, please contact Senior Policy Advisor, [redacted] by telephone at [redacted] or by email at [redacted]

Copies to:

Nathalie R. Asher
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
[redacted]

Tae Johnson
Assistant Director
Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
[redacted]

Claire Trickler-McNulty
Acting Assistant Director
Office of Detention Policy and Planning
U.S. Immigration and Customs Enforcement
[redacted]

Dr. Stewart D. Smith
Associate Director
ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
[redacted]

CAPT Luzviminda Peredo-Berger
Chief Medical Officer
ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
[redacted]

[redacted]

[redacted]

Enclosures

# Exhibit I

Allen Matkins

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attorneys at Law
2010 Main Street, 8th Floor | Irvine, CA 92614-7214
Telephone: 949.553.1313 | Facsimile: 949.553.8354
www.allenmatkins.com

**Catriona M. Lavery**
E-mail: clavery@allenmatkins.com
Direct Dial: 949.851.5493 File Number: 4897-9846-7009.1/392817.00013

July 27, 2026

Catherine Sweetser
Human Rights Litigation Clinic
UCLA School of Law
Box 951476
Los Angeles, California 90095-1476
Email: sweetser@law.ucla.edu

**Re: *Gonzalez v. The Geo Group, Inc.*, No. 2:22-cv-04014-JGB-ACCV**

Dear Catherine:

Thank you for your July 22, 2026 letter regarding Plaintiffs' motions in limine. Please see below for Defendant's preliminary responses as well as Defendant's planned motions in limine. We look forward to discussing with you further on our meet and confer call.

**<u>Plaintiffs' Motions in Limine</u>**

1. *Motion to "preclude questioning concerning Plaintiffs and Plaintiffs' witnesses' past convictions, arrests, and/or past drug use."* Defendant will of course abide by the rules of evidence and acknowledges FRE 609 and 403, but a decision to exclude testimony on these topics wholesale is not appropriate pretrial.

2. *Motion to "preclude three lines of testimony and argument that are directly contradicted by the video."* Weighing the parties' competing interpretations of events and what the video evidence shows is a classic factual question for the jury. Defendant will oppose this motion.

3. *Motion to exclude certain opinions of Defendant's expert Robert Fonzi.* Defendant is unable to fairly evaluate Plaintiffs' complaints about Mr. Fonzi's opinions at this time given the vague assertions in Plaintiffs' July 22 letter. Mr. Fonzi's opinions are proper expert opinions and apply the correct legal standard. Taking Plaintiffs' complaints about Mr. Fonzi's report at face value, Plaintiffs' expert Jerry Harper's report would appear to suffer from the same alleged defects.

4. *Motion to preclude "reference to the civil detainees at issue here as inmates or prisoners."* Defendant does not see these terms as necessarily prejudicial but is open to discussing some form of an agreement on this issue.

5. *Motion to preclude references to "unrelated incidents," such as "protests that happened at other facilities and protests not directly implicated in this case," "photos of Mr. Janecka's car and other damage from the June 8 protest," and "unrelated information about any other lawsuits or classes that Plaintiffs in this case may also be part of."* The categories referenced in this proposed MIL are too broad for Defendant to make any sort of agreement before trial regarding the admissibility of testimony or evidence on these topics. Other protests are plainly relevant and were discussed in discovery, deposition testimony, and even Plaintiffs' Complaint. The damage from the June 7, 2020 protest is particularly relevant to the context and circumstances surrounding the events on June 12, 2020. The final category (regarding "other lawsuits or classes") appears to be an entirely separate issue that should be its own MIL. As you are award, the Court has a limit of five motions in limine per side. In any event, this is too broad of a category for Defendant to make an informed decision before trial on whether "other lawsuits or classes" are inadmissible.

**Defendant's Motions in Limine**

1. *Motion to exclude reference to unrelated alleged excessive force incidents.* In depositions, Plaintiffs questioned Defendant's employees on prior use of force incidents in, for example, 2015, 2017, and/or 2018. Prior use of force incidents are not relevant and evidence or testimony regarding them would result in mini-trials and should be excluded. This includes the 2018 Office of Civil Rights and Civil Liberties Report on Plaintiffs' Exhibit List as Plaintiffs' Exhibits 6 and 10.

2. *Motion to exclude Plaintiffs' designated expert Jerry Harper's opinions regarding pepper spray/OC spray or Pepper Balls.* Mr. Harper is not qualified to render these opinions as he testified that he has never been certified in the use of pepper spray/OC spray or Pepper Balls and is not experienced with either. (*See* Harper Dep. 46:2-8; 84:12-14.) In addition, pending further understanding of Plaintiffs' arguments to exclude certain opinions of Mr. Fonzi, discussed above, Defendant intends to ensure that the same standard is applied to both sides' experts in this case. To the extent we understand Plaintiffs' positions, the same criticisms would seem to apply to Mr. Harper's opinions.

3. *Motion to exclude reference to Defendant's financial condition or that Defendant is a "for-profit" entity.* As discussed on our July 22 meet and confer call, Defendant will request bifurcation of the determination of the amount of punitive damages (if any), and Plaintiffs stated they would not oppose. As such, Defendant's finances are irrelevant to the first phase of trial on liability and non-punitive damages.

Sincerely,

*Catriona Lavery*

Catriona M. Lavery

# Exhibit J

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

April 25, 2018

MEMORANDUM TO: Matthew Albence
Executive Associate Director
Enforcement and Removal Operation
U.S. Immigration and Customs Enforcement

FROM: Veronica Venture (b) (6) [redacted]
Deputy Officer
Office for Civil Ri[redacted]

Dana Salvano-Dunn (b) (6) [redacted]
Director, Compliance
Office for Civil Rights and Civil Liberties

SUBJECT: Adelanto Correctional Facility Complaint Nos. (b) (6) [redacted]

The U.S. Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties (CRCL) is conducting an investigation into conditions of detention for U.S. Immigration and Customs Enforcement (ICE) detainees at the Adelanto Correctional Facility (ACF) in Adelanto, California. CRCL's onsite investigation, which occurred on November 13-14, 2017, was a follow-up review to our December 2015, onsite investigation. In addition, the onsite investigation was in response to three detainee deaths and CRCL's receipt of more recent allegations at ACF in the following areas: medical care, mental health care, use of force, hunger strikes, segregation, grievances, staff-detainee communication, legal access, language access, and suicide prevention and intervention.

We greatly appreciate the cooperation and assistance provided by ICE and ACF management and personnel before and during the onsite. As part of the review, CRCL used the same independent subject-matter experts that we used for the 2015 onsite: a medical consultant, a mental health consultant and a penologist. As a result of detainee and staff interviews, document reviews, and direct onsite observations, our experts identified concerns related to medical and mental health care, use of force, segregation and housing, grievances, staff-detainee communication, legal access, language access, and suicide prevention and intervention. At the

---

[1] Complaint No. (b) (6) [redacted], alleging inadequate conditions of detention and lack of appropriate visitation, was added to the Adelanto complaints after CRCL disseminated the Retention Memo to ICE.

conclusion of our onsite investigation, CRCL and the subject-matter experts held an exit-briefing where we relayed our findings to local ICE and ACF management and relevant field personnel. During those discussions, the subject-matter experts also provided recommendations to address many of the identified concerns.

Due to the serious nature of certain health and safety-related findings, CRCL also submitted initial informal recommendations to ICE leadership on November 20, 2017 for immediate action. We understand ICE has been working on addressing those matters over that last few months, including a site visit during the week of March 12, 2018.

Enclosed with this memorandum are the reports prepared by our subject-matter experts. The experts' priority recommendations are listed below in the body of this memorandum. CRCL requests that ICE formally concur or non-concur with these recommendations and provide an implementation plan for all accepted recommendations within 60 days.

**Recommendations**

***Medical Care***

CRCL's medical expert made the following priority recommendations regarding medical care at ACF. All of these recommendations relate to the 2011 PBNDS Medical Care Standard, which requires timely and efficient access to medical services

**Medical Leadership**

1. (b) (5) [redacted]
2. (b) (5) [redacted]

**Provider Staffing**

The ACF medical contractor, Core Civic Solutions (CCS), in consultation with IHSC, should increase day-to-day medical care for detainees at ACF. Attention should be focused on the following areas of concern:

3. Current staffing levels and appointment scheduling are inadequate and lead to a high rate of appointment cancellations and chronically delayed access to care. **The current inadequate provider staffing levels and appointment scheduling problems should be corrected in the following ways**. (PBNDS 2011 Medical Care: II.1, II.5 through 9, II.21 and 22, II.27, V.A and B, V.F.3.a, V.U and W, V.BB)

    a. Providers should not be allowed to fully control and change their own appointment schedules.

    b. Detainee appointment cancellations at ACF should be monitored and tracked.

    c. When detainee-patient cancellations *are* appropriate, the detainee should be rescheduled for the first available provider.

4. Those providers whose medical care has been sub-standard should be more closely monitored and supervised. Probation or temporary limitations of privileges should be considered for those problematic providers, in order to ensure improvements. (2011 PBNDS Medical Care: II.21, V.B, V.T and U)

**Detainee Returns from Offsite Care**

The current inadequate "hand-off" procedures being utilized, when detainees return from medical or mental health care at an outside hospital, emergency room or medical specialty consultation should be improved to ensure an appropriate continuum of care. (2011 PBNDS Medical Care: II.1, II.7 and 8, II.12, II.16 and 20, V. A and B, V.F.a, V.G.2 and 12, V.I, V.S.4 and 5, V.W) Attention should be focused in the following areas:

5. (b) (5) [redacted]

6. (b) (5) [redacted].

7. (b) (5) [redacted]

8. **In all cases where the ACF provider choses to deviate from the care recommended by the outside specialist, a full and complete note should immediately be entered in the medical record** documenting the clinical rational for deviating from the recommended care.

**Custody Staffing Support for Medical**
ACF custody staffing and transportation is currently inadequate to support medical operations and ensure uninterrupted access to appropriate and needed medical care. (2011 PBNDS Medical Care: II.7, V.A and B, V.R and S, V.W)

9. **Custody staffing and transportation capacity should be increased** to adequately support the medical operation and ensure uninterrupted access to appropriate and needed medical care.

10. **Medical appointments – either within the facility or outside (such as a consultation with an off-site specialist) – should not, absent extraordinary circumstances, be canceled due to unavailability of medical duty officers or "runners," or for lack of transportation vehicles** (including transport by wheel chairs or gurneys).

***Mental Health Care***

CRCL's mental health expert made the following priority recommendations regarding medical care at ACF. All of these recommendations relate to the 2011 PBNDS Medical Care Standard, which requires appropriate, timely, and efficient access to mental health services.

11. Following CRCL's 2015 investigation, it was reported to ERO and GEO management that psychiatric leadership was absent at ACF and that sub-standard mental health care was occurring as a result. During the 2017 onsite, there was no evidence that corrections had been implemented to address this concern. This failure to hire an effective, qualified psychiatric leader continues to pose a risk to the safety of other detainees at ACF. Accordingly, **ACF should hire competent, qualified and effective on-site psychiatric leadership, immediately.** (2011 PBNDS Medical Care: II.5, II. 8 and 9, II.12, II.14 through 16, II.20 and 21, II.25 and 27, II.30; V.A.1-7, V.B, V.F.1 through 3.a, V.G.1 through 4, V.G.6, V.G.11 and 12, V.I-J.2 and 4, V.J.12 and 13, V.J.16 through 19, V.M.1 and 2, V.N.1 through 6, V.Q, V.R.1.a and f, V.R.2, V.S.4 and 5, V.U, V.W, V.X.6 through 12, V.Y.1.b and .4.c.a), V.BB.2.e, V.DD)

12. (b) (5) [redacted]

13. The ACF medical contractor, in consultation with ICE IHSC and a skilled psychiatrist leader, should review all cases of ACF detainees with serious mental disorders to ensure accuracy or make appropriate changes. Attention should be focused on the following serious areas:

a. **Collateral data should be obtained for each ACF detainee with a serious mental disorder. Moving forward, this data should be acquired and entered in each detainee's initial mental health evaluation and reviewed by the admitting clinician.** In cases where collateral data was never obtained, clinicians should obtain it and document it in the chart. During the investigation, collateral data was absent in ***all*** cases reviewed. Typically, this data comes from the facility where the detainee was housed prior to their transfer to ACF, or from family members. If records cannot be obtained, ACF clinical staff should develop communicative relationships with staff at the facilities where ACF detainees most commonly come from and obtain this information by phone, which is permitted and expected under HIPPA, for purposes of patient safety and coordination of care. (2011 PBNDS Medical Care: II.1 and 5, II.15 and 23, II.30, V.J and K, V.M and N, V.S.5, V.U and W, V.Y, V.BB)

b. **IHSC and CCS and should review diagnoses and medication to ensure they are correct and appropriate. Attention should be given to taking detainees off ineffective medications** – such as those only absorbed well with a meal, but are not administered at ACF meal times, or antipsychotics prescribed as PRN's (as-needed medications) for detainees with clear histories of taking long-acting antipsychotic injections. If detainee-patients refuse medications or injections, the ACF mental health providers should work with the detainee so the detainee will accept them, and then document those compliance attempts. (2011 PBNDS Medical Care: II.1 and 16, II.20 and 27, II.30, V.G and H, V.J.2 and 4, V.J.11 through 13, V.J. 16 and 17 narrative, V.M, V.N.1 through 3, V.N.4 through 6, V.Q, V.R and S, V.W and Y, V.BB)

c. **There should be a housing review and assessment for each detainee with a serious mental disorder to determine whether their housing is appropriate, given the detainee's clinical status.** Although clinical staff reported that some stabilized detainees are segregated because they have *requested* to be in segregation, each detainee should be at the least restrictive level of care when at all possible and deemed appropriate by mental health leadership, taking into account the detainee's mental health status and progress. (2011 PBNDS Medical Care: II.5 and 6, II.13, II.27 and 30, V.F.3, V.N, V.Q and S, V.Y, V.BB)

d. Detainees with serious mental disorders are routinely – and inappropriately – housed in administrative segregation at ACF. **Detainees with serious mental disorders should only be housed in administrative segregation as a last resort,** as that environment is not conducive to improving mental health status. (2011 PBNDS Medical Care: II.5 and 6, II.13, II.27 and 30, V.F.3, V.N, V.Q and S, V.Y, V.BB; ICE Directive 11065.1, Review of the Use of Segregation for ICE Detainees [Segregation Directive] from the PBNDS 2011 revisions to 2.12 Special Management Units)

14. **In all cases where the ACF provider chooses to deviate from the mental health care recommended by an outside specialist (including a recommendation to continue a long-acting antipsychotic injection), a full and complete note should be entered in the detainee's medical record documenting the clinical rational for the deviation** from the outside provider's recommended care. (See recommendation 8 under Medical Care for further clarity.) (2011 PBNDS Medical Care: II.1, II.7 and 8, II.12, II.16 and 20, V. A and B, V.F.a, V.G.2 and 12, V.I, V.S.4 and 5, V.W)

15. **Custody staffing and transportation capacity should be increased to adequately support the mental health operation. No clinical mental health appointment – either within the facility or outside – should be canceled due to officer unavailability. Staffing and transportation should be increased to ensure uninterrupted access to appropriate medical/mental healthcare.** In 2015, it was recommended that the facility create an office on the West (men's) side for mental health staff to be able to see male detainees without reliance on officers to escort them to clinic, but this important recommendation was not implemented and resulted in related problems that were found during the 2017 onsite. It remains a necessary recommendation. (2011 PBNDS Medical Care: II.7, V.A and B, V.R and S, V.W)

16. **ACF's medical contractor, in consultation with ICE IHSC, should immediately institute an electronic Medication Administration Record (MAR).** Currently, there is no electronic capability allowing ACF mental health staff to see what medications any detainee-patient is currently taking. Although the current ECW has the capacity for this, security concerns were cited as a reason not to provide wireless accessibility throughout the facility. This prevents nurses from documenting on laptops when detainees take their medications or refuse them (which is the standard process in most correctional settings). The ability to do this is especially critical for psychiatric patients, who decompensate quickly when not taking their prescribed medications; often resulting in poor outcomes. ACF's lack of one master electronic MAR has resulted in there being three different records of current medications (ECW current meds, the paper MAR, and the progress notes) which were found to be often contradictory. When clinical staff are forced to go to great time-consuming lengths to pull up a paper MAR and compare the data for medication errors or poor patient adherence, the detainee's safety is at risk. (2011 PBNDS Medical Care: II.23 and 27, V.S, V.Y.1.a)

17. **ACF's medical contractor, in consultation with ICE IHSC, should immediately populate the electronic medical record (ECW) with the detainee-patients' location.** When ACF's clinical staff do not know where their detainee-patients are located, those detainees may not be seen as needed and required. In addition, staff may mistakenly assume the detainee is in an offsite hospital when they, in fact, have just returned to ACF, which is a vulnerable time for those detainees. The detainee's clinical team should know where their detainee-patient is located. It is technically possible, and should be made a priority for GEO to connect with ECW to populate this data, which will better

ensure patient safety. (2011 PBNDS Medical Care: II.8 and 12, II.20 and 23, V.F.3.a.3 and 4, V.G.12, Y.1.a and b)

***Conditions***

CRCL's corrections expert made the following priority recommendations. All of these recommendations relate to the 2011 PBNDS.

18. In 2015, CRCL recommended that ACF use interpreters and/or language lines consistently for LEP detainees during the intake screening process and completion of the important and required intake forms. ACF continues to fail to meet the Admission and Release Standard. Interpreters or language lines are not being consistently used for LEP detainees during the intake screening process and completion of the intake forms. **ACF should consistently use interpreters or language lines for LEP detainees during the intake process.** (PBNDS 2011 Admission and Release: II.8, V.F, V.G)

19. (b) (5) [redacted]

20. (b) (5) [redacted]

21. In 2015, CRCL recommended that the Mental Health Director and IHSC ensure that ACF Mental Health staff conduct daily face-to-face rounds with all detainees in the SMU, and provide appropriate mental health assessments and treatment. Daily rounds are being conducted; however, **one of the rooms in the SMU should be converted into an interview room where private face-to-face interviews between mental health personnel and detainees can be effectively conducted.** (PBNDS 2011 Special Management Units: II.6 and 7, II.8, V.A, V.F; Medical Care: V.F.1, V.N)

22. (b) (5) [redacted]

(b) (5) [redacted]

23. (b) (5) [redacted]

24. In 2015, CRCL recommended that ERO and ACF Management (including the Warden) develop a reporting system to ensure that facility personnel effectively respond to and resolve the detainee grievance issues assigned to them by the Grievance Coordinator and then report back to the Grievance Coordinator that the matter is resolved. This was not corrected. CRCL again recommends that **ICE and ACF should develop a reporting system to ensure that facility personnel respond and resolve detainee grievances.** (PBNDS 2011 Grievance System: II.2 and 3, II.6 and 8, V.A, V.B.7, V.C)

25. In 2015, CRCL recommended that ERO and ACF Management develop a tracking system to enable review and trend analysis of all grievances involving staff mistreatment. This was not corrected. **CRCL again recommends that ICE and ACF should develop a grievance tracking tool.** (PBNDS 2011 Grievance System: V.D and F, V.H)

26. In 2015, CRCL recommended that ICE should receive a copy of staff mistreatment grievances upon receipt by the GEO Grievance Coordinator. This was not corrected. CRCL again recommends that **detainee grievances involving staff misconduct should be submitted to ICE as mandated by the PBNDS.** (PBNDS 2011 Grievance System: V.F, V.G).

27. In 2015, CRCL recommended that ACF should hold facility staff accountable for substantiated abusive and disrespectful treatment of detainees, as determined by the Grievance Coordinator and/or other facility personnel. This was not corrected. CRCL again recommends that **ACF should hold facility staff accountable for substantiated abusive and disrespectful treatment of detainees.** (PBNDS 2011 Grievance System: V.G)

28. In 2015, CRCL recommended that ERO and ACF develop a post-assignment schedule that creates a sufficient staffing plan that resolves the current, problematic staffing deficiencies. The deficiencies are negatively affecting operational needs, including excessive count times and meal delays, and limitations in access to visitation, law library, and recreation. The post assignment schedule has been revised and additional correctional officer positions have been added, however this has not resolved the problem. **The correctional officer medical escort and transportation staffing should be increased to**

**adequately support the medical and mental health escort needs** within the facility and to outside appointments. (PBNDS 2011 Post Orders: V; Food Service: II.4, V.D; Visitation: II.4 and 6, V.B and J; Recreation: II.4, V.B; Law Library and Legal Material: II.2, II.4 and 5, V.C)

29. (b) (5) [redacted]

30. (b) (5) [redacted]

31. (b) (5) [redacted]

32. **ERO and ACF should ensure that all forms issued to detainees for informational purposes, but especially those requiring detainee signatures, are written and/or translated in a language the detainee comprehends, or provide oral interpretation of these forms and document the provision.** All written material provided to detainees shall generally be translated into Spanish. (DHS Language Access Plan, 2012) (2011 PBNDS: Multiple)

33. (b) (5) [redacted]

34. **A separate healthcare medical grievance log should be instituted to track healthcare-related grievance submissions and ensure timely responses.** (PBNDS 2011 Grievance System: II.10, V.A, V.C.2 and 4)

35. **A monthly audit should be conducted of submitted healthcare grievances to improve timeliness of care** and ensure appropriate access to medical, mental health and dental care. (PBNDS 2011 Grievance System: V.C.4)

36. **ACF must provide access to a cold-water shower in the East and West wings for decontamination of detainees who have been exposed to OC Pepper Spray**. (PBNDS 2011 Medical Care: V.F; Use of Force and Restraints: V.A.5, V.B.6 and 11, V.B.14, V.D.2)

It is CRCL's statutory role to advise department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. We look forward to working with ICE to determine the best way to resolve these complaints. You can send your response and action plan by email. If you

have any questions, please contact Senior Policy Advisor, (b) (6) [redacted] by telephone at (b) (6) [redacted] or by email at (b) (6) [redacted]

Copies to:

Nathalie R. Asher
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b) (6), (b) (7)(C) [redacted]

Tae Johnson
Assistant Director
Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b) (6), (b) (7)(C) [redacted]

Claire Trickler-McNulty
Acting Assistant Director
Office of Detention Policy and Planning
U.S. Immigration and Customs Enforcement
(b) (6), (b) (7)(C) [redacted]

Dr. Stewart D. Smith
Associate Director
ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b) (6), (b) (7)(C) [redacted]

CAPT Luzviminda Peredo-Berger
Chief Medical Officer
ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b) (6), (b) (7)(C) [redacted]

(b) (6), (b) (7)(C) [redacted]

(b) (6), (b) (7)(C) [redacted]

Enclosures