Catherine Sweetser, SBN 271142
UCLA Human Rights Litigation Clinic
**UCLA LAW CLINICS**
385 Charles E Young Drive
East Los Angeles, CA 90095
(t)(310)206-1182
(e) csweetser@sshhzlaw.com

Barrett S. Litt, SBN 45527
Lindsay Battles, SBN 262862
**McLANE, BEDNARSKI & LITT, LLP**
975 East Green Street
Pasadena, California 91106
(t) (626) 844-7660
(e) blitt@mbllegal.com
(e) lbattles@mbllegal.com

Paul Hoffman, SBN 071244
John Washington, SBN 315991
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
200 Pier Avenue, #226
Hermosa Beach, CA 90245
(t) (310) 396-0731
(e) hoffpaul@aol.com
(e) jwashington@sshhzlaw.com

*Attorneys for Plaintiffs.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO GONZALEZ, JOSE BACA, ERICK LOPEZ, MARIO MANJARREZ, and RICARDO SANDOVAL GUADARRAMA, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>The GEO Group, Inc., a Florida corporation, DOES 1-10,<br><br>Defendant. | Case No.  2:22-cv-04014-JGB-ACCV<br><br>**DECLARATION OF CATHERINE SWEETSER IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SANCTIONS**<br><br>Judge:  Hon. Jesus Bernal<br>Date:  August 31, 2026<br>Time:  11:00 a.m.<br><br>Judge:  Honorable Jesus G. Bernal |

**DECLARATION OF CATHERINE SWEETSER**

I, Catherine Sweetser, declare as follows:

1.      I am an attorney at the UCLA Human Rights Litigation Clinic and counsel of record for Plaintiffs in the above-captioned action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto. I submit this declaration in support of Plaintiffs' Motion for Sanctions.

2.      On July 16, 2026, I sent Defendant's a letter asking them to meet and confer about sanctions concerning the spoliation of the handheld video from Unit 3B. On July 22, 2026, Defendant sent a letter in response to mine and met and conferred with me about the motion.  Defendant did not agree that any sanction at all was warranted for the loss or destruction of the handheld video from Unit 3B.

3.      Attached as **Exhibit 1** is a true and correct copy of the preservation letter counsel in this case sent by email on June 19, 2020, demanding preservation of evidence related to the June 12 incident.

4.      Attached as **Exhibit 2** is a true and correct copy of excerpts from the deposition of Joshua Johnson, Person Most Knowledgeable for Defendant The GEO Group, Inc. (Volumes I and II), taken on August 6 and on August 8, 2024.  Mr. Johnson was designated as person most knowledgeable as to the video.

5.      Attached as **Exhibit 3** is a true and correct copy of excerpts from GEO's Policy Manual that was in effect as of June 12.  This is the same copy which Mr. Johnson was questioned about at his deposition, there referred to as Exhibit 24.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on <u>August 3</u>, 2026, at <u>Culver City</u>, California.

_____
Catherine Sweetser

DECLARATION OF CATHERINE SWEETSER IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SANCTIONS

# EXHIBIT 1

**LAW OFFICE OF
RACHEL STEINBACK**

3435 Wilshire Blvd, Suite 2910
Los Angeles, CA 90010

June 19, 2020

James Janecka
Warden
Adelanto ICE Processing Center
10250 Rancho Road
Adelanto, CA 92301
JJanecka@geogroup.com

Joe Negron
General Counsel
The GEO Group, Inc.
4955 Technology Way
Boca Raton, FL 33431
jnegron@geogroup.com

David Marin
Field Office Director
U.S. Immigration and Customs Enforcement
Department of Homeland Security
300 N. Los Angeles Street
Los Angeles, CA 90012
David.A.Marin@ice.dhs.gov

Gabriel A. Valdez
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Adelanto Detention Center
10400 Rancho Road
Adelanto, CA 92301
Gabriel.A.Valdez@ice.dhs.gov

Re:   Demand to Preserve Evidence

Dear Warden Janecka, Mr. Negron, Field Office Director Marin, and Assistant Field Office Director Valdez:

We write on behalf of the Inland Coalition for Immigrant Justice, Clergy & Laity United for Economic Justice, and the families of detainees at the Adelanto ICE Processing Center (hereinafter, "Adelanto"). Through them and others, we have received alarming reports of abuses being inflicted on detainees at Adelanto. This is particularly distressing because the ink is <u>barely</u> dry on the settlement we recently negotiated with The GEO Group, Inc. following a civil rights lawsuit we filed on behalf of eight detainees at Adelanto who were pepper sprayed, physically attacked, and isolated in retaliation for their peaceful complaints about the conditions at Adelanto.

Based on what we are reading and hearing, detainees are being exposed to toxic chemical disinfecting agents that are being improperly used by GEO Group staff – chemicals that are causing serious injuries, ranging from nose bleeds, burning eyes, blisters and migraines to respiratory issues and, in some cases, hospitalizations. We have received information that detainees who have complained about the chemicals and who have refused – on health and safety grounds – to go into their noxiously-fumed cells are being pepper sprayed by GEO Group staff and shot at with rubber bullets until they "comply." We have also received information that GEO Group staff are punishing detainees for the protests that are taking place <u>outside</u> the Adelanto facility – including, but not limited to, by restricting their ability to communicate with their attorneys, advocates and family. All of this conduct is blatantly unconstitutional.

email: steinbacklaw@gmail.com                    tel: 213.537.5370 | fax: 213.232.4003

To that end, in anticipation of litigation, we hereby demand that The GEO Group, Inc. and ICE immediately preserve all evidence relating to these incidents, including documentary evidence, video evidence, audio evidence, and electronic evidence. We hereby advise you that your offices and your employees are under a legal duty to maintain, preserve, retain, and protect any and all such evidence. You are also under a legal duty to take all steps necessary to prevent the destruction, loss, concealment, or alteration of any paper, document, audio recording, video recording, or electronically stored information ("ESI") and other data or information generated by and/or stored on your computers, storage media (e.g., thumb/flash drives, portable hard drives, floppy disks, backup tapes, etc.) or email servers that relate to these allegations. The failure to preserve, protect, and retain this evidence may constitute spoliation of evidence and will subject you to evidentiary sanctions and legal claims for additional damages.

While this does not constitute a comprehensive list of the evidence we are demanding you preserve, that evidence includes:

- All video and audio evidence of GEO Group employees spraying Oleoresin Capsicum ("OC") at detainees and/or shooting rubber bullets at detainees since May 2020. This video and audio evidence includes both the facility-wide video surveillance that GEO Group operates at Adelanto as well as all additional video recordings – including those taken by GEO Group "camera operators" on each shift, who are required to document every Use of Force incident, whether planned or unplanned.
- All documents relating to the use of OC spray against detainees – including but not limited to: all documents memorializing the weights of each OC canister at the beginning and end of each shift; all documents reflecting injuries sustained by detainees and staff as a result of OC spray; and all records reflecting the decontamination that GEO Group is obligated to perform immediately after an incident involving the deployment of OC spray.
- All documents relating to the shooting of rubber bullets at detainees, including but not limited to: all documents memorializing the number of rubber bullets used; all documents reflecting injuries sustained by detainees and staff as a result of the shootings; and all records reflecting the medical care provided to detainees who were shot with rubber bullets.
- All documents relating to the blocking of detainee telephone calls since May 2020.
- All documents relating to the chemical agent(s) GEO Group has been using since May 2020 to disinfect the Adelanto facility.
- All General Incident Reports, Use of Force Reports, and After-Action Review Reports regarding the allegations described herein.
- All Special Incident Reports regarding the allegations described herein.
- All communications – including electronic communications (email), facsimiles, letters, and phone records – that are in any way relevant to the allegations described herein. These communications include internal emails between GEO Group employees; emails between GEO Group employees and ICE; internal emails between ICE employees; and all other emails to or from GEO Group or ICE regarding the allegations described herein.

Preservation Letter                                                                           Page 3 of 3
June 19, 2020

      With regard to evidence created or acquired in the future, you are hereby required to preserve all documents, tangible things, and ESI that comprise or contain potentially relevant evidence and that are created or come into your custody, possession, or control following the delivery of this letter. You should take all appropriate action to avoid destruction of potentially relevant evidence.

      Thank you for your anticipated compliance. If you have any questions or wish to discuss this preservation letter in more detail, please do not hesitate to contact us.

      Sincerely,

*/s/ Rachel Steinback*
Rachel Steinback
LAW OFFICE OF RACHEL STEINBACK


*/s/ Catherine Sweetser*
Catherine Sweetser
Director, Human Rights Litigation Clinic
UNIVERSITY OF CALIFORNIA LOS ANGELES SCHOOL OF LAW

# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

HUGO GONZALEZ, JOSE BACA, ERICK

LOPEZ, MARIO MANJARREZ, and

RICARDO SANDOVAL GUADARRAMA, on

behalf of themselves and all

others similarly situated,

      Plaintiffs,

   v.                             Case No.

The GEO Group, Inc., a Florida       2:22-cv-04014-

corporation, DOES 1-10,          JGB-SHK

      Defendants.

_____

VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE

FOR THE GEO GROUP, INC. - JOSHUA JOHNSON

DATE:          Tuesday, August 6, 2024

TIME:          9:13 a.m.

LOCATION:     Remote Proceeding

               Adelanto, CA

OFFICIATED BY: Fernando Padilla

JOB NO.:      6800419

Page 1

involved in the incident writes a general incident report; is that right?

A    Yes.

Q    And you mentioned that people on the after action review Committee review video of the incident; is that right?

A    It's required by policy, yes.

Q    And are they also required to review all of the general incident reports that are prepared?

A    Yes.

Q    What other steps are there in the after action review?

A    What other steps?  They view the GIR's, video, and any additional evidence or information for any particular incident.

Q    What types of additional evidence or information would be reviewed?

A    In this situation or in general?

Q    In general.

A    There may be intel, there may be phone recordings, there may be a grievance, detainee request form.

Q    When you say there may be intel, what do you mean?

A    Like, if we have -- if -- we have a security

Page 40

center?

A    I don't remember.  Is this --

Q    And -- sorry --

A    -- is this the -- is this PMK or is this fact?

Q    I was asking about the policy, so --

A    Okay --

Q    You don't remember if it was a policy?

A    Yeah, the policy says that they'll be stored in central control.

Q    Okay.  And what was the policy for staff that wanted to check out a video camera?

MS. RIVARD:  Objection, vague as to time, vague as to purpose.

BY MS. BAIZER:

Q    And when I don't specify a time, you can assume I'm referring to June of 2020.

A    Staff typically do not check out video cameras.  They're only used in emergency situations, and staff responding, one is designated to pick up the video camera.

Q    Okay.  And who would have assigned the video camera --

A    That would be determined by the watch commander.

Q    Okay.  And was the policy the same for an

Page 161

emergency use of force and a calculated use of force?

A    Are the policies the same for --

Q    For videotaping both of those.

A    No.  In immediate use of force, the video will be started as soon as it's reasonable and safe because it's immediate, and calculated, they're supposed to have video cameras available.

Q    So in terms of assigning the camera to the camera operator, was the process and the policy over that the same in an immediate use of force and a calculated use of force?

A    No, a -- a calculated use of force, they would have a designated camera person.

Q    And would that person be a member of the CERT team?

A    Not necessarily.

Q    Was that someone who was always designated during any shift, or how soon was the designation made before the use of force?

A    It's just an available staff member.

Q    So it would necessarily be someone who was already on shift?  Someone would not get called into the facility to be the camera operator?

A    No.

Q    And in June 2020, was it the policy that the

Page 162

camera person or the person assigning the audiovisual
equipment would need to write down on a log when the
equipment was used?

A   I'm not aware of that.

Q   Was there anything else besides a use of force
at the facility, was there any other actions that were
required to be videotaped?

A   In --

Q   Sorry, go on.

A   In 2020, or --

Q   Yes.

A   I don't know if there was another event that
needed to be recorded.  We had the two protests I know
were recorded --

Q   The outside protests?

A   The outside and then obviously the -- the June
12th.  I'm -- I'm sure there's other events, because
it's for anything that they feel like they need to
video.  Like, if it's a fight or whatever, they'll
-- they'll take the video cameras with them.

Q   Do you know in June 2020 if it was GEO policy
that any protest outside the facility had to be video
recorded?

A   It's part of the Disturbance Plan, I believe.

Q   And in June 2020, what was the policy for

Page 163

storing the video after a use of force took place?

A    The video is supposed to be stored and saved.

Q    In what format?

A    Off the -- everything's stored on a CD, I believe, back then.

Q    And was there any backup, for example, the CD and possibly a hard drive?, or was it just the CD?

A    There may have been a hard drive as well.

Q    Was it stored on kind of a shared drive, or an individual employee's computer?

A    No, it's actually very limited access on saving any video.  Only a few people have access to it.  I, myself, do not even have access to it.

Q    So if there were a backup saved on a hard drive, who would have done the saving on the hard drive?

A    It would have been the IT -- or MIS specialist or STG.

Q    And that video would have been saved on their personal work computer?

A    It would have been saved on the hard drive and burned in a CD.

Q    And in June 2020, where in the facility where the CDs of the videos kept?

A    They would have been under lock and key in the STG department, and I believe a copy of -- for a use of

Page 164

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

force, a copy would have been attached to the use of force paperwork.

Q    The person who was responsible for taking the video of a use of force, what was the procedure for handing over that video after the completion of the use of force?

A    Typically, the procedure is STG would collect the camcorders after the event if he was on site or the next business day when he returned, and he would download the -- the media.

Q    Would he collect the camera directly from the video operator?

A    No, the -- the video operator would place the -- the camcorder in the watch office safe, and he would retrieve it from there.  Now, if he was on site, he would collect it directly from that individual.

Q    And how did the video operator or operators, how did they get access to that safe?

A    Through the watch commander.  They give the camera to the watch commander who will, in turn, put it in the safe.

Q    Okay.  And do you know at all what would have been the length of time in between when the video operators handed the camera over and when that footage would have been burned to a CD?

Page 165

MS. RIVARD:  Calls for speculation, foundation.

BY MS. BAIZER:

Q    If you know.

A    No, I don't know the time.

Q    After the footage was saved to a CD and potentially that hard drive, were the memory cards of the cameras wiped?

A    Yes.

Q    And a couple more questions about the access to the videos.  So of course, there are instances, for example, during the after action review, when staff at the facility needed to view videos of a use of force after it had occurred.  So if a staff member needed to view video of any use of force, not just the June 12, 2020, use of force, how would they have gone about doing that in 2020?

A    Why would staff need to review the video? It's -- it's controlled.

Q    For example, if they were conducting the after action review.

A    Okay --

MS. RIVARD:  Objection, vague.  I think the problem is:  Who do you mean by staff?  Are you talking about the after action reviewers who are on the

Page 166

committee or somebody else?

MS. BAIZER:  I'll back up.

BY MS. BAIZER:

Q    In what circumstances would staff be required to view an audiovisual recording of a use of force after it had occurred?

A    Once again, I'm confused.  You're saying "staff."  Like, are you talking officer, or are you talking a supervisor?  Is it --

Q    Any member of the GEO staff.

A    Well, not any member is going to have access to that video and need to replay it.  Pretty much the only people that saw it after the event would have been the after action committee and the facility administrator and the ICE.

Q    I'm not asking specifically about the June 12th incident, although it is helpful.  The question was:  In what circumstances would any GEO staff member be required to view video of a use of force after that use of force had occurred?  Is it only in the context of an after action review?

MS. RIVARD:  Argumentative as phrased.

A    Yeah, I'm -- I'm not sure I'm understanding the way you're phrasing the question.

Q    When would a GEO staff member need to view

Page 167

video of a use of force after the use of force had occurred?

MS. RIVARD:  Objection, vague as to "staff member."

BY MS. BAIZER:

Q   Any staff member at that office or facility, I should say, not GEO corporate.

A   Yeah.  There's certain staff that would need to view that.  Like, your typical officer would not need to view video after the fact.  So when you say "staff," I'm -- I'm very confused on it.  They don't have access to it.

Q   So is it that, in 2020, the only people who would typically view a video of a use of force after the use of force that occurred are the same people that would be on the after action review?

A   They're the only ones that would review the -- the video after it was captured.

Q   Okay.  That's what I was trying to get at. And how would they gain access to the video?

A   So it's saved with the STG or the MIS department, and then it's provided on a CD.

Q   So when the after action review committee is meeting, do they all view the video together?

A   That is correct.

Page 168

Q    In 2020, what was the policy if an audiovisual recording of a use of force was lost?

A    There would have to be an investigation to determine what happened to it or a memo placed in if it was a technical glitch or whatnot if it was known to be lost.

Q    When you say "if it was known to be lost," what do you mean by that?

A    Like, if we know about something being lost, then we'd have to put a memo in or do an investigation if it disappeared.

Q    And who would have done the investigation?

A    That have been determined by the facility administrator.

Q    And if an employee who had been the camera operator on that day, if it was determined that he or she had, in fact, lost that video equipment, would there be any professional repercussions for that employee?

A    It would --

MS. RIVARD:  Objection, vague as to "lost."

THE WITNESS:  If it was known, there would potentially be some disciplinary action, yes.

BY MS. BAIZER:

Q    And the same, what was the protocol or

Page 169

procedure if it was determined that a video of a use of force had been destroyed after the use of force took place?

A    Same thing.  An investigation, statements would be collected, and it could potentially lead to disciplinary action if known.

Q    Do you know of any instances where handheld video was found to have been lost or destroyed after it had already been downloaded to the CDs?

MS. RIVARD:  Objection, assumes facts, improper and incomplete hypothetical.

A    Prior to that, I -- can you rephrase that question again?

THE WITNESS:  You made me forget it.

BY MS. BAIZER:

Q    Sure.  So typically, I would -- withdrawn.

So the process for preserving a video of use of force is that certain personnel in the facility will take the video camera and will burn the footage onto a CD; is that a correct understanding?

MS. RIVARD:  Misstates testimony.

A    Yes.

Q    And do you know of any instances where after there was an investigation into potential lost or destroyed video, it was determined that the video was

Page 170

lost and destroyed after it had already been handed over to that person who was responsible for making the CD?

MS. RIVARD:  Objection, compound, assumes facts not in evidence, improper and incomplete hypothetical.

A    I'm not aware of any lost or damaged video prior to 2020.

Q    But that wasn't the question.  The question was if there was any time when there was an investigation into potentially lost or destroyed video where it was determined that the video was lost and/or destroyed after the camera operator had already relinquished control of the audiovisual equipment.

MS. RIVARD:  Compound, assumes facts.

A    I'm unaware of any -- any lost or damaged video.

Q    Okay.  And in June 2020, who was responsible for making sure the audiovisual equipment was operational?  And when I say "operational," that it was working and that the batteries were charged.

A    I believe on third watch, they do -- well, they do inventory every watch.  The third watch is to check and make sure everything is operational, so it would be central control on third watch.

Q    You said "central patrol"; is that correct?

Page 171

A    Yes, our central control.

Q    Central control.  And how often was this process completed?

A    They did an inventory once -- once per shift, but they did an operational check once per day.

Q    And what would have happened if the camera, in fact, ran out of battery during the use of force?

A    It depends on the scenario.  Staff are supposed to, if the battery's going dead, say something onto the camcorder, and then at the conclusion, they'll -- if they can't get another battery -- they can go get another battery.  They can get another battery, but at the conclusion of the -- the event, they have to reporting in their GIR that the battery ran out.

Q    And if a staff did not write that on the GIR, would there be any consequences?

A    There's potentially going to be disciplinary action.  It's more of a training moment.  That's why we do an after action.

Q    Are staff trained -- or was it policy at all in 2020, that if the audiovisual equipment at the facility ran out of battery that staff were supposed to, or could, use their own audiovisual equipment, for example, a cell phone camera, to record the use of force?

Page 172

its last documented use.  In the event of litigation,

the facility shall retain the relevant audiovisual

records a minimum of six months after the litigation has

concluded or been resolved."

BY MS. BAIZER:

Q    And just for the record, I believe you alluded

to this before, but just explicitly, when GEO policies

conflict with the PBNDS, is it necessarily the PBNDS

that controls?

A    Yes.

Q    What would happen if it was determined that a

video was no longer at the facility less than six years

after its last use?

MS. RIVARD:  Objection, vague as to "no

longer at the facility."

BY MS. BAIZER:

Q    Had been lost or destroyed.

A    An -- an investigation would had been

conducted, statements would have been gathered, and if

it was determined that it was lost or whatever, then it

would -- may lead to disciplinary action.

Q    And was there a particular policy for if the

video was lost less than six years and litigation

regarding that video had been initiated?

MS. RIVARD:  Vague and ambiguous.

Page 181

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

HUGO GONZALEZ, JOSE BACA, ERICK

LOPEZ, MARIO MANJARREZ, and

RICARDO SANDOVAL GUADARRAMA, on

behalf of themselves and all

others similarly situated,

       Plaintiffs,

   v.                      Case No.

THE GEO GROUP, INC., a Florida      2:22-cv-04014-

corporation, DOES 1-10,         JGB-SHK

       Defendants.

_____

VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE

FOR THE GEO GROUP, INC. - JOSHUA JOHNSON

VOLUME II

DATE:          Thursday, August 8, 2024

TIME:          9:22 a.m.

LOCATION:      Remote Proceeding

               Adelanto, CA

OFFICIATED BY: Fernando Padilla

JOB NO.:      6856853

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

used to submit that if he did, in fact, submit it because I couldn't see the end of the thread.

Q   Was any of the handheld video footage that was taken on June 12, 2020, lost?

MS. RIVARD:  Calls for Speculation. Foundation.

A   I was unaware, but just my own personal judgment watching how this thing's playing out, I'm assuming some is missing, yes.

Q   Was there any investigation into that lost video?

MS. RIVARD:  Objection.  Misstates testimony as "lost" versus "missing."

MS. BAIZER:  Sorry, can you -- I can't hear you, what your objection was.  Can you repeat that?

MS. RIVARD:  It was objection, misstates testimony as far as "lost" versus "missing."

Can you hear me?

MS. BAIZER:  Yes.

MS. RIVARD:  Okay.

THE WITNESS:  I'm not aware.

BY MS. BAIZER:

Q   What was the name of the individual who took the video that became missing?

A   I don't know anybody who took a video that's

Page 444

missing; that's why it's missing.

Q    Well, did anybody inform ICE or DHS that some of the video from June 12, 2020, may have gone missing?

MS. RIVARD:  Calls for speculation. Foundation as phrased.

A    I'm unaware of any communication about any lost video.

Q    Was any of the audio visual footage from June 12, 2020, destroyed either purposefully or inadvertently?

MS. RIVARD:  Calls for speculation. Foundation.

A    I'm not aware of any video being lost or destroyed.

Q    Who was the individual who was responsible for making sure that the cameras and other audio visual equipment was operational and charged on June 12th?

A    The -- the watch commander and the central control officer -- they're supposed to conduct inventories prior to assuming their post and ensure that all equipment -- not just video cameras, but cell phones, handcuffs, radios -- are in good working order.

Q    And when would have been the most recent inventory check prior to the use of force?

A    Probably the shift before.

Page 445

# EXHIBIT 3

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|  Secure Services™ **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** **CHAPTER: Security** **TITLE: Use of Force** **RELATED ACA STANDARDS: 4-ALDF-2B-01 – 08, 7B-16** | **NUMBER:** 10.2.15 **SUPERSEDES:** 3/6/19 |

## I. POLICY

The GEO Group, Inc., Adelanto ICE Processing Center authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the detainee. The use of force, security equipment and restraint equipment is intended only as a control measure when absolutely necessary—these measures are not intended and will not be used as a means of punishment.

It is a violation of this policy to harass or otherwise verbally provoke a detainee or detainees into an assault on staff in order to justify the use of force against those detainees. Non-force forms of intentional cruel punishment, such as public humiliation, are also prohibited.

## II. PROCEDURAL GUIDELINES

The use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority. In no event will a canine unit be used during a use of force or physical force used as punishment. [4-ALDF-2B-01]

### A. Principles Governing the Use of Force and Application of Restraints

1. Instruments of restraint shall be used only as a precaution against escape during transfer; for medical reasons, when directed of the medical officer; or to prevent self-injury, injury to others, or property damage. Restraints should be applied for the least amount of time necessary to achieve the desired behavioral objectives.
2. Under no circumstances shall staff use force to punish a detainee.
3. Staff shall attempt to gain a detainee's willing cooperation before using force.
4. Staff shall use only that amount of force necessary and reasonable to gain control of a detainee.
5. Staff may use restraints only when other non-confrontational means, including verbal persuasion, have failed or are impractical.
6. Staff may immediately use restraints, if warranted, to prevent a detainee from harming self or others or from causing serious property damage.
7. Detainees subjected to use of force shall be seen by medical staff as soon as possible.

GEO 10586

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**



| | | |
|---|---|---|
| **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**<br>**Use of Force** | **NUMBER: 10.2.15** |

8. Facility Administrator approval is required for continued use of restraints, if they are considered necessary, after a detainee is under control.

9. Staff may apply additional restraints to a detainee who continues to resist after staff achieves physical control. If a restrained detainee refuses to move or cannot move because of the restraints, staff may lift and carry the detainee to the appropriate destination. Staff may not use the restraints to lift or carry the detainee. If feasible, an assisted device (e.g., ambulatory chair, gurney) will be used to help move the restrained detainee.

10. Staff may not remove restraints until the detainee is no longer a danger to himself or others.

11. Staff may not use restraint equipment or devices (for example, handcuffs):

    ▪ On a detainee's neck or face, or in any manner that restricts blood circulation or obstructs the detainee's airways (e.g. mouth, nose, neck, esophagus).

    ▪ To cause physical pain or extreme discomfort. While some discomfort may be unavoidable even when restraints are applied properly, examples of prohibited applications include: improperly applied restraints, unnecessarily tight restraints, "hog-tying," and fetal restraints (cuffed in front with connecting restraint drawn-up to create the fetal position).

12. Staff will comply with their defensive tactics training and the proper application of those techniques. Staff shall monitor all detainees placed in restraints.

13. During a use of force, hard restraints (for example, steel handcuffs and leg irons) shall be used only after soft restraints prove (or have previously proven) ineffective with a particular detainee. Attempts to use soft restraints prior to hard restraints shall be documented in the use-of-force reports.

14. Documenting, reporting, and investigating use-of-force incidents helps prevent unwarranted use of force and protects staff from unfounded allegations of improper or excessive use of force.

15. Calculated use of force requires supervisor pre-authorization and consultation with medical staff to determine if the detainee has medical issues requiring specific precautions.

16. At no time will pregnant detainees be routinely restrained and/or shackled, absent truly extraordinary circumstances that render restraints absolutely necessary. However, mechanical restraints may be used to prevent self-harm and/or harm to others. Restraints must not be placed in a manner to cause injury to the fetus. Wait/belly chains are prohibited for use on pregnant detainees. **Medical staff MUST be contacted.**

**PROCEDURES:**

GEO 10587

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|   **Secure Services™**  **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**  **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

## Use-of-Force Continuum

The Use-of-Force Continuum is a five-level model used to illustrate the levels of force staff may use to gain control of a detainee. The levels are:

- Staff presence without action.

- Verbal commands.

- Soft techniques. Techniques from which there is minimal chance of injury (for example, grasping, empty-hand, "come-along" holds, using impact weapons for holds, pressure to pressure points, chemical agents).

- Hard techniques. Techniques where there is a greater possibility of injury (for example, strikes, throws, "take-downs," striking using impact weapons (such as deploying chemical agents, expandable batons, straight batons, authorized less-lethal devices, specialty impact weapons).

- Deadly force is the use of any force that is reasonably likely to cause death or serious physical injury. Deadly force does not include force that is not reasonably likely to cause death or serious physical injury, but unexpectedly results in such death or injury.

While staff are trained and required to use only a level of force that is necessary and reasonable to gain control of a detainee, a higher level may be appropriate, depending on the totality of the circumstances. Staff may have to escalate or de-escalate through the Use-of-Force Continuum.

### A.  Types of Force

1. Minor Use of Force consists of any physical contact with a detainee in a confrontational situation to control behavior or to enforce order, including the placement of hands on the detainee in an effort to cause him/her to do anything involuntary.

**Major Use of Force:**

a. A minor use of force becomes a major under any of the following conditions:

- If restraints are applied in order to restore or preserve order unless such restraints are routinely required to assure control of an individual or group.
- Chemical agents, firearms, water, batons, or other instruments are used. (Chemical agents are used only with the authorization of the Facility Administrator or designee.)

**GEO 10588**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



| | | |
|---|---|---|
| **GeO** Secure Services™ **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** **Use of Force** | **NUMBER: 10.2.15** |

- If any offensive or defensive physical contact or hold is employed, including any of the following: One or more physical blows, hard pushes, come along holds, defensive holds; or if, in the opinion of medical staff, an injury has occurred during a minor use of force, such as a bruise or wound.

b.    The major use of force is specifically authorized when there is imminent and immediate danger of physical injury to employees, detainees and/or other persons, to maintain or regain control of a facility or in the event of a rebellion,   riot or disturbance and when all of the following conditions exist:

- Minor use of force would be insufficient to manage the situation.
- All reasonable actions have been taken to stabilize the situation, and to bring in additional staff to help in responding to the situation.

c.   Major Use of Force becomes deadly force if authorized firearms are used.

### *Staff member are not authorized to use deadly force*

**Immediate Use of Force** – An "immediate-use-of-force" situation is created when a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility. In that situation, staff may respond without a supervisor's direction or presence.
Upon gaining control of the detainee, staff shall seek the assistance of qualified health personnel to immediately:

1. Determine if the detainee requires continuing care and, if so, make the necessary arrangements.  Continuing care may involve such measures as admission to the facility hospital, restraining a pregnant detainee in a way that does not include face-down, four/five-point restraints, etc.

2. Examine the detainee and immediately treat any injuries.  The medical services provided shall be documented.

3. Examine any involved staff member who reports an injury and, if necessary, provide initial emergency care. The examination shall be documented.

4. A written report shall be provided to the shift supervisor by each officer involved in the use of force by the end of the officer's shift.

GEO 10589

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|  Secure Services™ **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

The Shift Supervisor shall provide a written report to the Facility Administrator or designee no later than the end of a tour of duty when force was used on any detainee, or if any detainee remains in restraints at the end of that shift.

**Calculated Use of Force and/or Application of Restraints.** If a detainee is in a location where there is no immediate threat to the detainee or others (for example, a locked cell or range), staff shall take the time to assess the possibility of resolving the situation without resorting to force.

A calculated use of force needs to be authorized in advance by the Facility Administrator (or designee).

Calculated use of force is feasible and preferred in most cases and is appropriate when the detainee is in a location where the detainee poses no immediate threat of harm, even if the detainee is verbalizing threats or brandishing a weapon, provided staff sees no immediate danger of the detainee's causing harm to himself or others. Calculated use of force affords staff time to strategize and resolve situations in the least confrontational manner and assist to de-escalate the situation.

a. **Circumstances.** Based on experience, calculated rather than immediate use of force is feasible in the majority of incidents correctional practitioners encounter. Staff must use common sense and good correctional judgment in each situation to determine when there is time for the calculated use of force.

The safety of persons involved is the major concern. Obviously, immediate (and unplanned) use of force by staff is required if a detainee is trying to self-inflict life-threatening injuries, or is attacking a staff member or another detainee. If those circumstances are not present, staff should ordinarily employ the principles of calculated use of force.

Calculated use of force would be appropriate, for example, if the detainee is in a cell or in an area where the door is (or can be) secured, even where a detainee is verbalizing threats or brandishing a weapon, provided staff believe there is no immediate danger of the detainee hurting self or others. The calculated use of force situation permits the use of other staff (classification, department heads) in attempting to resolve situations in a non-confrontational manner.

b. **Documentation and Audiovisual Recording.**

**GEO 10590**

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|   Secure Services™  **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**  **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

The confrontation avoidance process will be documented in writing for placement in the detainee's central file, and will be videotaped to include an introduction of all staff participating in the confrontational avoidance group and the actual confrontation avoidance process.

Video equipment will be comprised of a handheld digital video camera and the necessary additional equipment to convert the captured video in DVD format on DVD disks as well as a standard DVD player,

This tape and documentation will be made part of the investigation package for the After Action Review process.

The entire interaction shall be documented in writing to reflect each staff member's actions and response while participating in the confrontation avoidance process.

**NOTE: ICE detainees are not convicted felons; they are in the Adelanto ICE Processing Center as Administrative Detainees. DEADLY FORCE IS NOT AUTHORIZED ON A DETAINEE ABSCONDING CUSTODY.**

Staff members are subject to the above stated guidelines and procedures regarding the Use of Force Continuum, and are reminded that it is their responsibility and obligation to abide by the intent of the guidelines, which is to ensure the protection, safety, and security of each and every person who enters the facility, including staff members, detainees and visitors. The purpose of these guidelines is to protect the physical well-being of everyone in this environment. Any staff member who violates any of the guidelines and principles of the "Use of Force Continuum" as defined by this company, bears the responsibility for their actions and will be held accountable, as appropriate.

**B.    Use of Force Team Technique**

When a detainee must be forcibly moved and/or restrained during a calculated use of force, staff shall use the use-of-force team technique under staff supervision to prevent or diminish injury to staff    and detainees and exposure to communicable disease. The technique usually involves five or more trained staff members clothed in protective gear, including helmet with face shield, jumpsuit, stab-resistant vest, gloves, and forearm protectors. Team members enter the detainee's area together and have coordinated responsibility for achieving immediate control of the detainee.

GEO 10591

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|  **GEO** Secure Services™ Adelanto ICE Processing Center | **POLICY AND PROCEDURE MANUAL** **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

C.  **Confrontation Avoidance Procedures**

Prior to any calculated use of force, the ranking custodial official (ordinarily the Assistant Facility Administrator of Security or Shift Supervisor), a designated mental health professional, and others shall confer and gather pertinent information about the detainee and the immediate situation. Based on their assessment of that information, they shall identify a staff member(s) to attempt to obtain the detainee's voluntary cooperation and using the knowledge they have gained about the detainee and the incident, determine if use of force is necessary.

Ordinarily, in calculated use of force situations, there is time for the Assistant Facility Administrator of Security or Shift Supervisor, the designated health professional, or anyone else so designated, such as the Classification Officer, to confer with each other and to assess the situation.

This discussion may be accomplished by telephone or in person, the purpose being to gather relevant information about the detainee's medical/mental history, any recent incident reports, or situations which may be contributing to the detainee's present state of mind (e.g., the recent death of a loved one, or a divorce).

This assessment could include discussions with staff that are familiar with the detainee's background or present status. This information may provide insight into the cause of the detainee's immediate agitation, and assist in the identification of staff members who may have some rapport with the detainee, or who are more likely to be successful in attempting to reason with the detainee.

D.  **Use of Force Safeguards**

To prevent injury and exposure to communicable disease in calculated use of force situations, the following shall occur.

1)  Staff participating in any calculated use of force, including those participating in the "Use of Force Team Technique," shall:

    a.  Wear appropriate protective gear, and
    b.  Receive training on communicable diseases during Annual Refresher Training.

2)  Personnel with a skin disease or skin injury shall not be permitted to participate in a calculated use of force action.

GEO 10592

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

| **GeO**<br>Secure Services™<br>**Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**<br>**Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

3) Whenever possible, in an immediate use of force circumstance, staff should obtain and use appropriate protective equipment (helmets with face shield, jumpsuits, gloves, pads, etc.) prior to intervening:

    a. If an emergency situation results in a use of force, precautions such as clothing help to decrease the chances of transmission.

    b. Any time staff members are going into a cell or area where there is reason to believe that blood or body fluids would be present, protective devices shall be available and shall be used by those staff entering that area.

4) Following any use of force incident, any area where there is spillage of blood, or other body fluids, shall be sanitized immediately upon the authorization of the Shift Supervisor, who must first make the determination as to whether there is a need to preserve evidence.

    a. All blood and body secretions shall be immediately removed in an appropriate waste disposal container and the area washed with an antiseptic solution, pursuant to the "Guidelines for Blood Spill Clean-Up."

    b. Standard sanitation measures should be implemented following any use of force incident where there has been a spillage of blood or other body fluids by any detainee or staff member involved. Staff wearing protective gloves should immediately sanitize the cell walls or floors, etc., with an appropriate disinfectant, pursuant to the "Guidelines for Blood Spill Clean-Up." In addition, any clothing that has been contaminated with these fluids, including the equipment and clothing of the staff involved in the use of force, should be immediately disinfected or destroyed, as appropriate. Detainees will not be utilized to clean up blood spills.

**E. Progressive and Ambulatory Restraints**

When sufficient for protection and control of a detainee, staff shall apply **ambulatory restraints**, which are soft and hard equipment that provides freedom of movement sufficient for eating, drinking, and other basic needs without staff assistance or intervention;

If ambulatory restraints are insufficient to protect and control a detainee, staff may apply **progressive restraints**, which are more secure or restrictive. The Facility Administrator shall decide on the appropriate restraint method, i.e., hard restraints with/without waist chain or belt; four/five-point soft restraints with hard restraints to

**GEO 10593**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|   Secure Services™  **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**  **Use of Force** | **NUMBER: 10.2.15** |
| --- | --- | --- |

secure the detainee to a bed; four/five-point hard restraints, etc. In situations involving a highly assaultive and aggressive detainee, progressive restraints may be needed as an intermediate measure while placing a detainee in, or removing a detainee from, four/five-point restraints .Once a detainee has been placed on ambulatory restraints, the Shift Supervisor is required to conduct a physical check of the detainee once every two hours to determine if the detainee has stopped the behavior which required the restraints and thus restraints are no longer necessary. Once a positive behavioral change has been achieved, a decision to remove the restraints or place the detainee in less restrictive restraints shall be made. If this has not been achieved, the shift supervisor shall document the reason for continuance of the ambulatory restraints. The supervisor shall provide a written report to the Facility Administrator no later than the end of the tour of duty when any detainee remains in restraints at the end that shift.

**When it is necessary to restrain a detainee for longer than eight hours, the Facility Administrator or designee shall be notified immediately for a decision on whether the use of restraints should continue.**

Ambulatory restraints should initially be used to restrain a detainee if deemed appropriate for the situation. If the situation dictates the need for more restrictive or secure restraints, based on the detainee's behavior, staff should make the determination as to what form of restraint method should be used; i.e., hard restraints without waist chain or waist belt, hard restraints with waist chain or waist belt, and finally, four-point soft restraints with hard restraints used for securing the detainee to the bed.

In situations involving highly assaultive and aggressive detainees, progressive restraints may be used as an intermediate measure in placing the detainee into, or removing a detainee from, four-point restraints.

Medication may only be used for restraint purposes when authorized by the Medical Authority as medically necessary.

**F. Use of Four-Point Restraints**

When four/five-point restraints are necessary, staff shall:

- Use soft restraints (for example, vinyl), unless they:
  - Were previously ineffective with this detainee, or
  - Proved ineffective in the current instance.
- Provide the detainee with temperature-appropriate clothing and a bed, mattress, sheet and/or blanket. Under no circumstance shall a detainee

GEO 10594

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



| | POLICY AND PROCEDURE MANUAL<br>Use of Force | NUMBER: 10.2.15 |
|---|---|---|
| Adelanto ICE Processing Center | | |

remain naked or without cover (sheet or blanket) unless deemed necessary by qualified health personnel.

- Check and record the detainee's condition at least every 15 minutes to ensure that the restraints are not hampering circulation and to monitor the general welfare of the detainee. If the detainee is confined by bed restraints, staff shall periodically rotate the detainee's position to prevent soreness or stiffness.
- Document all checks of detainees in four/five point restraints every 15 minutes.

Staff shall use the appropriate logbook to record each 15-minute check of detainees in four/five-point restraints. Documentation shall continue until restraints are removed. The shift supervisor shall be immediately notified if the detainee is calm, to permit re-evaluation of the use of restraints.

Four/five point restraints are used only in extreme instances and only when other types of restraints have proven ineffective. Advance approval is secured from the Facility Administrator or designee before a detainee is placed in a four/five point restraint. Subsequently, the health authority or designee must be notified to assess the detainee's medical and mental health condition, and to advise whether, on the basis of serious danger to self or others, the detainee should be in a medical/mental health unit for emergency involuntary treatment with sedation and/or other medical management, as appropriate. If the detainee is not transferred to a medical/mental health unit and is restrained in a four/five point position, the following minimum procedures are followed:

1. Direct visual observation by staff is continuous prior to obtaining approval from the health
   Authority or designee

2. Subsequent visual observation is made at least every 15 minutes

3. restraint procedures are in accordance with guidelines approved by the designated health
   authority

4. all decisions and actions are documented. [4-ALDF-2B-03]

### Medical Staff

A health professional shall test the detainee's breathing, other vital signs, and physical and verbal responses. If the detainee is bed-restrained, the health

GEO 10595

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|   Adelanto ICE Processing Center | **POLICY AND PROCEDURE MANUAL**<br>**Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

professional shall determine how the detainee should be placed. Qualified health personnel are required to visit the detainee at least twice per eight-hour shift. When qualified health personnel are not immediately available, staff shall place the detainee in a "face-up" position until the medical evaluation can be completed. Medical checks shall be documented.

**Shift Supervisor**

The Shift Supervisor shall be responsible for the following:

- The Shift Supervisor shall review a detainee in four/five-point restraints every two hours. If the detainee has calmed down and restraints are no longer necessary, they may be removed and, if appropriate, replaced by a less restrictive device.
- At every two-hour review, the detainee shall be afforded the opportunity to use the toilet, unless the detainee actively resists or becomes combative when released from restraints for this purpose.
- The decision to release the detainee or apply less restrictive restraints shall not be delegated below the shift supervisor's level. The Shift Supervisor may seek advice from mental or medical health professionals about when to remove the restraints.

The Shift Supervisor shall document each two-hour review in the appropriate logbook.

**Facility Administrator**

- When any detainee is restrained for more than eight hours, the Facility Administrator shall telephonically notify the Assistant Field Office Director and provide updates every eight hours until the restraints are removed.

  The Facility Administrator shall provide the Field Office Director with written documentation of the reason(s) for placing the detainee in four/five-point restraints, regardless of duration, on the following workday

**G.    Use of Chemical Agents or Non-Lethal Weapons**

The Facility Administrator may authorize the use of chemical agents or non-lethal weapons, only when the situation is such that the detainee:

1) Is armed and/or barricaded; or,
2) Cannot be approached without danger to self or others; and,
3) It is determined that a delay in bringing the situation under control would constitute a serious hazard to the detainee or others, or would result in a major disturbance or serious property damage.

The following restraint equipment is authorized:

**GEO 10596**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|  **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**<br>**Use of Force** | **NUMBER: 10.2.15** |
| --- | --- | --- |

- Handcuffs: Stainless steel, 10 oz.;
- Leg Irons: Stainless steel and must meet National Institute of Justice standard;
- Martin chain;
- Waist or Belly Chain: Case-hardened chains with a minimum breaking strength of approximately 800 pounds;
- Handcuff Cover: Cases for the security of handcuffs used on high security detainees;
- Soft Restraints: Nylon/leather type with soft arm and leg cuffs containing soft belts with key locks;
- Plastic Cuffs: Disposable; and
- Any other ICE/DRO-approved restraint device.

Qualified health personnel shall be consulted prior to staff using chemical agents, pepper mace, or non-lethal weapons, unless the circumstances are such that immediate use is necessary. Whenever possible, the detainee's medical file should first be reviewed to determine whether the detainee has any diseases or condition which would be dangerously affected if the chemical agent, pepper mace, or non-lethal weapon was used. This includes, but is not limited to: asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure.

Oleoresin Capsicum (OC) is intended to prevent injury to the subject involved, the staff involved and other persons present. The governing factor in employing its use is the Facility Administrator's belief that its use is both **REASONABLE AND NECESSARY.** The only personnel authorized to deploy the Oleoresin Capsicum (OC) sprays are certified trained personnel.

1. Prior to administering the chemical agent (Oleoresin Capsicum aerosol spray), the staff member will give a verbal warning to the detainee that they will be spraying and the effects of the chemical agent.

2. When the subject has been subdued through the use of a chemical agent (Oleoresin Capsicum aerosol spray), staff members will make physical contact with the subject. At this point, staff members will be expected to maintain control of the situation.

The subject will then be taken into custody, handcuffed, and control holds or other restraints devices, leg chains, belly chains, as appropriate to the situation, will be utilized as the subject is escorted

GEO 10597

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|  Secure Services™ Adelanto ICE Processing Center | POLICY AND PROCEDURE MANUAL Use of Force | NUMBER: 10.2.15 |
| --- | --- | --- |

to the appropriate holding area for processing. Staff members should be prepared, at this point, to anticipate the opportunity to de-escalate the situation by returning to the "Verbal Commands" stage of the "Use of Force Continuum".

3.    Staff members are reminded that the use of chemical agent (Oleoresin Capsicum aerosol spray) is not to be taken lightly. It is the responsibility of each and every staff member in the company to ensure that the "Command Presence", "Verbal Command" and "Show of Force" stages of the continuum have been ***fully*** exhausted prior to making the decision to utilize a chemical agent (Oleoresin Capsicum aerosol spray).

5.    All staff authorized to use OC spray receive training not only in its use, but also in the decontamination of individuals exposed to it. This training must be documented in the staff training record.

Because of the nature of chemical agents (OC) any area in which the chemical agent (OC) has been employed, and any personnel, visitor, and/or detainee who come into contact with the chemical agent (OC), will be decontaminated/cleaned in a manner consistent with the chemical agent (OC) employed. In any instance in which a chemical agent (OC) has been used, a member of the medical staff will be required to examine and treat anyone upon whom the chemical agent (OC) is used or has come in to contact with. Anyone that is exposed directly to OC should, as soon as practicably possible be removed to fresh air and kept in an upright position until normal breathing returns.

**Application of OC shall cease immediately upon the detainee(s) compliance with given orders.**

h.    **Medical Attention in Use of Force and Application of Restraints Incidents**

1) In immediate use of force situations, staff shall seek the assistance of qualified health personnel upon gaining physical control of the detainee. When possible, staff shall seek such assistance at the onset of the violent behavior. In calculated use of force situations, the use of force team leader shall seek the guidance of qualified health personnel (based on a review of the detainee's medical record) to identify physical or mental problems. When qualified health personnel determine that a

GEO 10598

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|   Secure Services™  **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**  **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

detainee requires continuing care, and particularly when the detainee to be restrained is pregnant, the deciding staff shall assume responsibility for the detainee's care to include possible admission to the institution infirmary.

2) After any use of force or forcible application of restraints, the detainee shall be examined by qualified health personnel, and any injuries noted, should be immediately treated.

If any staff involved in a use of force reports an injury, qualified health personnel should provide immediate examination and initial emergency treatment.

### I. Use of Force in Special Circumstances

Occasionally, after the failure of confrontation avoidance techniques, staff must make a judgment whether to use higher levels of force with detainees with special circumstances. Staff shall consult with medical staff in certain cases set forth below before deciding the situation is grave enough to warrant the use of physical force. Situations in which consultation with medical staff is required include:

### Pregnant Detainees

Medical staff shall determine precautions required to protect the fetus, including:
- Safest method of restraint
- Presence of a medical professional
- Medical necessity of restraining the detainee

### Detainees with Wounds or Cuts

Staff shall wear protective gear when restraining aggressive detainees with open cuts or wounds. If force is necessary, this gear shall include a full-body shield. Aggressive detainees in restraints shall be placed in administrative detention, segregated from all other detainees. Such detainees shall generally remain administrative detention until cleared to return to the general population by the Captain and the Health Services Administrator, with the Facility Administrator's approval.

### J. Document of Use of Force and Application of Restraints Incidents

Staff shall appropriately document all incidents involving the use of force, chemical agents, firearms or non-lethal weapons. Staff shall also document, in writing, the use of restraints on a detainee who becomes violent or displays signs of imminent violence. A copy of the report shall be

**GEO 10599**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|  Secure Services™ **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** Use of Force | **NUMBER: 10.2.15** |
|---|---|---|

placed in the detainee's file.  In addition, the procedures outlined in Corporate Policy 7.1.3, Serious Incident Reporting, shall be followed.

1) **Report of Incident.** A Use of Force/Restraints Report is to be prepared on the use of force, chemical agents, pepper mace, application of progressive restraints, or non-lethal weapons by the Shift Supervisor. This reporting requirement includes the application of progressive restraints to a detainee when the detainee is compliant with the placement into restraints.  The report is to establish the identity of detainees, staff, and others involved, and are to describe the details of the incident.  The report (to include mental health/medical reports) must be submitted to the Facility Administrator or designee by no later than the end of that tour of duty [4-ALDF-2B-07].  A copy of the report is to be placed in the detainee's file.  All staff members involved in the use of force incident shall submit complete reports prior to the end of that tour of duty.  Copies are also to be sent to:
   a. Assistant Facility Administrator of Operations
   b. Health Services Administrator
   c. I.C.E. COTR (to be delivered by the Facility Administrator)
   d. Captain

2) **Four-Point Restraints Report.**  Fifteen-minute checks of detainees placed in four-point restraints shall be recorded.  Documentation of 15-minute checks shall continue until the four-point restraint placement is terminated.


   During reviews of detainee's status while in four-point restraints (i.e., every two-hour review where the detainee is allowed to use the toilet facilities and his or her behavior is evaluated), each negative response by the detainee shall be documented in the bound ledger.

3) **Calculated-use-of-force videotape is to be filmed as follows:**

   a. Prior to any calculated use of force the Shift Supervisor will verify that the video camera is working by taping a short test segment and reviewing it for video and audio. If the camera is not functioning the Shift Supervisor shall ensure that a camera is obtained in working condition prior to continuing    with    the calculated use of force.

   b. Introduction by Shift Supervisor, stating facility name, location,

GEO 10600

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|    Adelanto ICE Processing Center | POLICY AND PROCEDURE MANUAL Use of Force | NUMBER: 10.2.15 |
|---|---|---|

time, date, etc.; describing the incident that led to the calculated use of force; naming the video-camera operator and other staff present.

c. Faces of all team members briefly appear (helmets removed; heads uncovered), one at a time, identified by name, title, and responsibilities of his/her position on the use of force team.

d. Shift Supervisor offering detainee last chance to cooperate before team action, outlining use-of-force procedures, engaging in confrontation-avoidance, and issuing use-of-force order.

e. Entire, continuous tape of Use-of-Force Team operation, unedited, until detainee is in restraints.

f. Close-ups of detainee's body during medical exam, focusing on the presence/absence of injuries, staff injuries, if any, described but not shown.

g. Debriefing, including full discussion/analysis/assessment of incident.

The video tape is to be catalogued and preserved until no longer needed, but no less than 30 months after its last documented use. In the event of litigation, the Captain is to retain the tape a minimum of six months after its conclusion/resolution.

Use of force equipment is to be kept in the GEO armory. The Captain is responsible for such storage.

The video camera(s) and other video equipment is the responsibility of the Captain. This responsibility is to include regular scheduled testing to ensure all parts, including batteries, are in working order; and keeping back-up supplies on hand (batteries, tapes, lens-cleaners, etc).

When an immediate threat to the safety of the detainee, staff or others, or to property, requires an immediate response, the staff members have an obligation to obtain a camera and begin recording the event as soon as it is feasible. Once control of the situation has been obtained, staff should record information about injuries, a description of the circumstances that gave rise to the need for immediate use of force, and the identification of the detainees, staff and others involved.

GEO 10601

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|  **Secure Services™** **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

4) **Documentation Maintenance.** The Captain shall maintain all documentation, including the videotape and the original Use of Force/Restraints Report, for a minimum of two and one-half years. A separate file shall be established on each use of force incident.

**K.** **After-Action Review of Use of Force and Application of Restraints Incidents**

Following any incident involving the use of force, whether calculated or immediate, and the application of restraints, if applicable, the Facility Administrator, Assistant Facility Administrator, Captain, Health Services Administrator and the Field Office Director's designee shall meet and review the incident. The review is to assess the reasonableness of the actions taken (e.g., if the force used was appropriate and in proportion to the detainee's actions).

They should gather relevant information, determine if policy was followed, and then complete an After-Action Report, recording the nature of their review and findings. The After-Action Report should be submitted within two working days after the detainee is removed from restraints.

1) **Videotape Review.** The After-Action Review Team should also review the video tape for the following:

a. Professionalism of the Shift Supervisor during the Forced Cell Team Technique should be evident. The Shift Supervisor must be in proper uniform. Shift Supervisors should not be dressed in riot gear or wearing chains or jewelry or other ornamentation that would detract from a professional appearance. The actions of staff during a use of force situation shall be narrated by the Shift Supervisor supervising the situation. In addition, the Shift Supervisor should face the video camera and speak normally;

b. Use of Force Team members shall wear appropriate protective gear. This ordinarily includes:

helmet with face shield,
Black Dress Uniforms (BDUs),
shield,
flack vest,
arm and knee pads, and
leather gloves.

**GEO 10602**

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**

|  Secure Services™ **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

No other piece of equipment or device is authorized. Equipment not authorized includes: towels, tape, surgical mask, hoses, etc. Each Use of Force Team member should introduce himself/herself on the video and describe his or her responsibilities;

c. Use of Force Team members, as they enter the cell or area, must use only the amount of force necessary to subdue the detainee. If the detainee is already restrained, voluntarily submits to the placement of restraints, discontinues his or her violent behavior, etc., it may be necessary for the Use of Force Team to minimize the amount of force used.

d. The Shift Supervisor in charge of the Use of Force Team shall ensure only the force necessary is used, based on the nature of the situation. The Shift Supervisor must clearly monitor the actions of the detainee and the team members. The Shift Supervisor should not be actively involved in subduing the detainee, unless it is determined necessary to prevent staff or detainee injury;

e. The application of restraints by team members must be reviewed to ensure no more pressure than necessary is applied to the detainee's thorax (chest and back), throat, head and extremities;

f. The amount of time it takes for team members to restrain the detainee should be reviewed. If an excessive amount of time elapses, i.e., more than five minutes, and the detainee is not struggling with staff, it may be that team members are not adequately trained;

g. Team members should not remove protective gear while inside the cell or area. Protective gear must remain on team members during the entire process;

h. The videotape must run continuously during the entire process. If there are breaks or apparent missing sequences in the video, reviewers must question why and document the propriety of the explanation;

i. A member of the health services staff must promptly examine the detainee after the move and the findings must be noted by that person on the videotape;

j. When a Stun Gun, chemical agents, or pepper mace is used, the method

GEO 10603

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



| | POLICY AND PROCEDURE MANUAL<br>Use of Force | NUMBER: 10.2.15 |
|---|---|---|

**Adelanto ICE Processing Center**

of use must be determined. Review Team members should ensure that use of these devices was in accordance with existing policy.

k. Prior to the team entering the cell, the detainee was given the opportunity to voluntarily submit to the placement of restraints. If he or she submits, then team action is ordinarily unnecessary; and,

l. Inappropriate conversations (derogatory, demeaning, taunting, etc.) occurring between team members and the detainee, or between team members and individuals outside of the cell or area.

m. Report Completion. When this review is completed, an After-Action Review Report shall be completed, as soon as possible, not later than two working days after the detainee has been removed from restraints. Accordingly, the length of time a detainee is kept in restraints is appropriate. This will ensure that staff having relevant information will be available and that any necessary medical follow-up can be immediately provided to ascertain the nature of any injuries involved.

The Facility Administrator or designee shall then personally attest by his or her signature that the review has taken place and that the use of force was either appropriate or inappropriate.

n. **Further Investigation.** The reviewers should also decide if the matter requires further investigation, and whether the incident should be referred to the Office of Professional Responsibility. If deemed appropriate, the Facility Administrator's rationale for such an assessment shall be included.

o. **Report on Restraints Use.** A report is not necessary for the general use of restraints. For example, a report is not required in the routine movement or transfer of detainees.

L. **Training in the Confrontation Avoidance/Use of Force Technique**
In order to control any potential situation involving aggressive detainees, all staff must be made aware of their responsibilities through ongoing training. At a minimum, training must cover:

1. The requirements of the PBNDS on Use of Force;
2. The Use-of-Force Continuum to include use of deadly force;
3. Communication techniques to include professionalism

GEO 10604

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**



| | | |
|---|---|---|
| **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL**<br>**Use of Force** | **NUMBER: 10.2.15** |

4. Cultural diversity;

5. Dealing with detainees with mental health conditions;

6. Confrontation-avoidance techniques;

7. Approved methods of self-defense, defensive tactics;

8. Forced cell move techniques;

9. Communicable diseases, particularly precautions to be taken when using force;

10. Application of restraints (progressive and hard);

11. Reporting procedures, camera operations; and

12. Forced medication procedures.

13. Debriefing

**Video Taping Procedures.**

At a minimum, two persons on every shift will be designated as "Camera Operators" and shall receive additional training above and beyond the outlined in Corporate and Local Policies. This training shall include initial training as well as quarterly refresher training. All training will be documented and placed in the employee's training file.

**M.    Equipment Inventory**

Procedures for storage and control of weapons, chemical agents and other force related equipment are as follows:

1.    The Facility Administrator will designate an area(s) to be utilized for storage and control of Use of Force related equipment. These areas shall be restricted from all detainee activities and shall be securely maintained. Additional equipment will be stored in a secure area outside the main facility but readily accessible.

2.    An accurate monthly inventory will be maintained of all items stored in the storage areas. A monthly inventory report of all Use of Force equipment shall be submitted to the Captain. Lost or damaged Use of Force equipment will be immediately reported to the Assistant Facility Administrator of Operations as well as any other replacement needs.

**GEO 10605**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

|  **Adelanto ICE Processing Center** | **POLICY AND PROCEDURE MANUAL** <br> **Use of Force** | **NUMBER: 10.2.15** |
|---|---|---|

3. All Use of Force related equipment in the storage area will be maintained in excellent working condition. Weapons and firearms will be clean and in good repair. Chemical agents will be properly stored.

4. The Facility Administrator will designate an employee to be responsible for the issuance of Use of Force related equipment in the event that application of force becomes necessary. The employee will maintain a log of all items issued and returned to the storage area.

**N.    Restraints**

Restraint devices are never applied as punishment and when applied they will not be applied for more time than is necessary. [4-ALDF-2B-02] Staff are authorized to apply physical restraints necessary to gain control of a detainee who appears to be dangerous because the detainee:

1) Assaults another individual;
2) Destroys facility property;
3) Attempts suicide;
4) Inflicts injury upon self; or
5) Becomes violent or displays signs of imminent violence.
6) At no time will pregnant detainees be routinely restrained and/or shackled. However, mechanical restraints may be used to prevent self-harm and/or harm to others. Restraints must not be placed in a manner to cause injury to the fetus. Wait/belly chains are prohibited for use on pregnant detainees. **Medical staff MUST be contacted.**

This rule on the application of restraints does not restrict the use of restraints in situations requiring precautionary restraints, particularly in the movement or transfer of detainees (e.g., the use of handcuffs in moving detainees to and from a cell in detention, escorting a detainee to Segregation/Special Management Unit (SMU) pending investigation).

This rules purpose is not to discourage employees from using force when it is necessary, but to provide guidance and instruction on appropriate procedures to follow when confronted with a situation requiring the use of force.

GEO 10606

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER



| | POLICY AND PROCEDURE MANUAL<br>Use of Force | NUMBER: 10.2.15 |
|---|---|---|

Adelanto ICE Processing Center

## THIS POLICY WILL BE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

### Italic areas are the changes made to the current revision.

QUESTIONS/SUGGESTIONS REGARDING THIS POLICY SHALL BE ADDRESSED TO THE ASSISTANT FACILITY ADMINISTRATOR OF SECURITY.

APPROVED: _____
Facility Administrator

EFFECTIVE: March 27, 2020

Reviewed & Revised: October 2011
Reviewed & Revised: February 2012
Reviewed & Revised: June 2012
Reviewed: July 2013
Reviewed: September 2014
Reviewed & Revised: June 2015
Reviewed: March 2016
Reviewed: February 2017
Reviewed & Revised: August 2017
Reviewed: August 2018
Reviewed: March 2019
Reviewed: March 2020

**GEO 10607**